[No. A091063. First Dist., Div. Two. July 18, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
TY L. TRUONG, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II.

## COUNSEL

Ford Greene, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Gerald L. Engler and Ann Wathen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KLINE, P. J.**—Ty L. Truong was convicted of assault with a deadly weapon, misdemeanor battery upon a spouse, and misdemeanor vandalism after an incident in which he committed a battery upon his wife, from whom he was separated, and stabbed her boyfriend. His sentence was increased pursuant to an enhancement for infliction of great bodily injury under circumstances involving domestic violence. On appeal, he contends this enhancement could not constitutionally be applied to great bodily injury inflicted upon a third party rather than upon one of the parties involved in a domestic relationship. He further maintains the enhancement must be

stricken because the trial court failed to instruct the jury on the definitions of "domestic violence" and "abuse." We affirm.

## STATEMENT OF THE CASE

Appellant was charged by information filed on November 23, 1999, with one count of infliction of corporal injury to a spouse/cohabitant/child's parent (Pen. Code,[1] § 273.5, subd. (a)), assault with a deadly weapon (§ 245, subd. (a)(1)), first degree residential burglary (§§ 459, 460) and misdemeanor vandalism (§ 594, former subd. (b)(4)). In connection with the assault and burglary counts, it was alleged that appellant personally inflicted great bodily injury upon Edward Moreno under circumstances involving domestic violence (§ 12022.7, subd. (d)), personally inflicted great bodily injury against Edward Moreno (§ 12022.7, subd. (a)) and personally used a knife (§§ 667, 1192.7).

Jury trial began on January 3, 2000. On January 7, the jury found appellant guilty of the lesser included offense of misdemeanor battery upon a spouse/child's parent (§ 243, subd. (e)(1)) in count one; assault with a deadly weapon in count two; and vandalism in count three, and found the special allegations in count two true. It found appellant not guilty in count three.

On February 25, the court sentenced appellant to 180 days in county jail on each of counts one and four, with 360 days of credit for time served. On count two, the court imposed the mitigated term of two years, plus a consecutive three years for the section 12022.7, subdivision (d), enhancement and a stayed three-year term for the section 12022.7, subdivision (a), enhancement. The court then suspended execution of sentence and placed appellant on formal probation for five years.

Appellant filed a timely notice of appeal on April 24, 2000.

## STATEMENT OF FACTS

Appellant's wife, Hong Truong, testified that she and appellant separated in approximately June or July 1999. Appellant stayed at a friend's apartment, although he sometimes stayed at Truong's home and he kept clothes there. Truong and appellant had four children who were cared for by Truong's landlady when Truong went to work.

In August 1999, Truong began to date Ed Moreno. On September 22, she and Moreno went to bed about midnight. About 3:00 a.m., Truong heard a

---

[1]All further statutory references will be to the Penal Code.

noise outside, checked around the house and saw appellant at the window. She opened the door for him and when he came in, he opened the door so fast that Truong was pushed into the wall. Truong initially testified that this caused a bruise on her face but no marks on the wall, then later testified that her face did not hit the wall and that she had lied at the preliminary hearing when she stated that her face was injured when appellant pushed her into the wall.

Truong testified that appellant went into the kitchen and, when she asked what he wanted to do, told her it was none of her business. Appellant went into the bedroom; as Truong walked behind him, she saw he was carrying a knife with a 10- to 12-inch blade. Truong grabbed appellant's hand to stop him from doing something with the knife and when appellant pulled his hand she was cut. She did not see appellant stab Moreno, but saw the knife with blood. Appellant walked out of the bedroom, punched his hand in the wall, went to the kitchen and washed his face and hands, then left through the front door. Truong was walking beside him and, because appellant was walking too fast, Truong walked into the wall. After appellant left, she locked the security gate and called the police. She was not aware of anything going on outside.

When Truong went to bed on the night of September 22, her car was parked in her driveway with its windows intact. After appellant left and the police left, Truong saw that the car windows had been smashed out. In the morning, she saw that the windows on Moreno's truck had also been smashed.

Truong initially testified that she read and understood her statement to the police before she signed it, then stated that she did not read the documents carefully. She testified that she did not remember what she had told the police and that she was truthful in her account to the police. Truong denied telling the officer that she and appellant had been divorced for five or six years before the incident, that appellant punched her in the side of her face with his fist when he came into the house or that appellant stabbed Moreno with two knives. She did not remember whether she told the officer that appellant took two knives from the kitchen, that he cut her hand with the knife when he pushed her as he was leaving the bedroom or that she heard glass breaking outside when she called 911. Truong testified that 80 percent of her police statement was not true.

Truong testified that she told Moreno that appellant was a good man and he should not make "a big deal" out of the incident. She felt she was at fault, not appellant, and would have preferred that charges against appellant not be pressed.

Moreno, who was living with Truong at the time of trial, testified that he was awakened about 3:00 a.m. on September 23 by appellant, who was stabbing him in his leg. Appellant pulled the knife out and swung at Moreno's chest; Moreno broke the knife off with his arm, and appellant's glasses fell off. The knife entered Moreno's upper outer thigh and exited on his inner thigh, cutting the muscles and nerves in Moreno's leg and leaving him with no feeling in his leg. Moreno testified that the blood was running out "like a faucet" and he thought he was bleeding to death. As appellant left the room, he grabbed Truong's head and shoved it into the wall, bruising the right side of her head and leaving an indentation on the wall. Moreno spent two days in the hospital and had to keep his leg elevated for about a month because it was still hemorrhaging.

Moreno testified that appellant was never at Truong's house when he was there, appellant did not have clothes or a toothbrush at her house, and to Moreno's knowledge, appellant did not spend nights there. Moreno described two incidents that predated the night of the stabbing. In the first, early in September, Moreno was sitting in the Star Club bar, where Truong was working as a bartender, when appellant came in yelling at Truong. Appellant told Moreno that Truong belonged to him and no man could have her. On the second occasion, about two weeks before the stabbing, Moreno and Truong were standing outside the Star Club bar, where Truong was a bartender. Appellant got out of a car, screaming and cussing at Truong and Moreno. Appellant was "looking for a fight." Moreno told him, "[i]f you want to fight, go ahead and hit me first. I'm not going to hit you." Appellant yelled some more, then left.

San Pablo Police Officer John Benone was dispatched to Truong's address about 3:15 a.m. on September 23. When he arrived, he saw appellant standing next to a blue Lincoln Town Car, bleeding from his left hand. He noticed a white pickup truck in front of the house with its windows smashed and a blue Honda Civic in the driveway with its windows smashed. There was a tire iron on the hood of the Lincoln's trunk. Appellant was arrested and an ambulance called because of the injury to his hand; he was taken to the hospital and then to the police station.

When Benone entered the bedroom of Truong's house, he found Moreno screaming in pain. Officer Lee and paramedics were already at the scene. The right side of Truong's face was slightly swollen and she had a slight laceration on her right pinkie. The police seized a knife with a wooden handle from the kitchen sink and a broken knife and a pair of glasses from the bed. An investigator from the district attorney's office subsequently found a "moon-shaped" indentation and crack about four and a half to five inches long on the hallway wall, about 59 inches above the floor.

Benone took a verbatim statement from Truong at 3:47 a.m. She spoke with a heavy accent, but she understood Benone and he understood her; she was "upset and nervous but calm." Truong referred to appellant as her ex-husband and told Benone she and appellant had been divorced for five to six years and appellant lived behind Walgreens in San Pablo. She said that she had heard a knock on her window and got up to check it out, then opened the front door and did not see anyone; while she was closing the door, appellant pushed it open. Truong said that appellant punched her on the side of her head with his fist. She said that he went into the kitchen and took two knives, then went to the bedroom and stood by the bed where Moreno was sleeping. She then saw appellant stab Moreno simultaneously with both knives. As appellant left the room, he pushed Truong, cutting her finger. Truong told Benone that appellant then washed his hands in the kitchen, put one of the knives in the sink and left. Truong locked the door and called 911. She said that she heard glass breaking out front and heard a knock on the door. Appellant wanted to come in but Truong would not let him. Benone read Truong's statement to her line-by-line and then she read it and signed it after agreeing that it was a true statement.

Benone advised appellant of his *Miranda*[2] rights at the police station at 4:51 a.m. and appellant waived them. Appellant was calm and looked sad. Appellant told Benone that he was homeless. According to appellant, he went to Truong's house about 3:30 a.m. because he needed a place to sleep, saw Moreno's truck in front and was mad because he knew Moreno was seeing Truong. He knocked on the window and then on the door, which was opened by Truong. Truong tried to stop appellant from entering. Appellant went into the kitchen, asked if he could borrow some knives, took two kitchen knives and went into the bedroom. There, he saw Moreno undressed in bed and went "a little crazy." Appellant was not sure what he did but "believed" he stabbed Moreno. He then left the room. In the hallway, Truong tried to force him out and while they were pushing he "might have" hit Truong in the head with his elbow. Appellant went into the kitchen, washed his hands and put the knife in the sink.

Appellant went outside, then discovered his hand was bleeding and went back to the house to try to rewash his hands. Truong refused to let him in and this "pissed him off." Appellant got a tire wrench from his car and smashed the windows of Truong's and Moreno's cars.

---

[2]*Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

*Defense*

Appellant testified that as of September 1, 1999, he was still living with Truong and two of their children in San Pablo; the other two children were in San Diego with Truong's parents, attending school. The landlady, who also lived in the house, babysat when Truong worked and shopped and cooked for the family. Appellant had two jobs, one in Stockton and the other in Redding; he worked as a "professional gambler," with hours from late afternoon to beyond midnight.

Around September 1, appellant and Truong had an argument and appellant took some of his clothing and left the house. He gave the landlady his keys, having negotiated for a reduction of rent based on the family's using only one rather than two rooms in the house. Appellant left many of his belongings behind, however, and returned to the house many times between September 1 and September 23. He did not want the landlady to know he was still staying at the house because of the rent reduction, but he still considered the house his, still paid the rent and still considered himself and Truong husband and wife. He and Truong discussed getting back together but appellant wanted Truong to "change her character a little" before he would return. Truong had introduced appellant to Moreno one night when appellant picked her up from work at the Star Club.

On September 22, Truong called appellant to tell him one of the children wanted to talk to him. He got off work in Stockton about 2:00 a.m. and went to the house. He saw Moreno's truck parked outside and was angry because he suspected Moreno was in the house and Truong was having an affair. He knocked on the window of the bedroom and Truong motioned for him to go to the front door, where she let him in "like normal." Appellant went to the kitchen and took two knives; Truong asked what he was doing and appellant told her not to worry about it, then told her "as a matter of politeness" that he wanted to borrow two knives. Appellant then went to the bedroom and saw Moreno naked in his bed. At that moment, appellant did not know what he was doing, but he recalled leaving the house and smoking a cigarette after washing his hands in the kitchen. Appellant testified that he did not do anything to Truong when he first entered the house and did not remember what happened when he left the bedroom. He denied slamming Truong's head into the wall, stating "I did not beat my wife that badly." Appellant stated that he "usually" did not beat his wife but had done so for "educational" purposes, when she was disrespectful; he explained that "[a]mong Vietnamese, among Orientals, when we love one another we have to educate

one another." By having a man in the bedroom, Truong was being "[t]oo disrespectful." Appellant also denied punching Truong.

After leaving the house and getting a cigarette from his car, appellant realized his hand was bleeding and rang the doorbell. When they refused to open the door, he took a wrench from his car and smashed the car windows.

Appellant denied telling the police officer that he was homeless. He understood the officer's questions and did not recall whether he actually read his statement before signing it. He acknowledged that he probably told the officer that he and Truong had been in an argument in September and that he had moved out.

## DISCUSSION

At all times relevant to this case, section 12022.7, subdivision (d), provided: "A person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission or attempted commission of a felony shall, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of three, four, or five years. The court shall order imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state its reasons for its enhancement choice on the record at the time of sentencing. As used in this section, 'domestic violence' has the meaning provided in subdivision (b) of Section 13700."[3]

Section 13700, subdivision (b), defines "domestic violence" as "abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship. For purposes of this subdivision, 'cohabitant' means two unrelated adult persons living together for a substantial period of time, resulting in some permanency of relationship. Factors that may determine whether persons are cohabiting include, but are not limited to, (1) sexual relations between the parties while sharing the same living quarters, (2) sharing of income or expenses, (3) joint use or ownership of property, (4) whether the parties hold themselves out as husband and wife, (5) the continuity of the relationship, and (6) the length of the relationship."

Section 13700, subdivision (a), defines "abuse" as "intentionally or recklessly causing or attempting to cause bodily injury, or placing another person

---

[3]This language is now contained in subdivision (e) of section 12022.7. (Stats. 2000, ch. 919, § 1.)

in reasonable apprehension of imminent serious bodily injury to himself or herself, or another."

I.

 Appellant argues he could not constitutionally be convicted of the section 12022.7, subdivision (d), enhancement for infliction of great bodily injury under circumstances involving domestic violence. He maintains that the statute is unconstitutionally vague and that the scope of the enhancement is limited to victims of domestic violence.

In the trial court, appellant argued that the section 12022.7, subdivision (d), enhancement was "inapplicable to the assault of Mr. Moreno" because he was not the victim or perpetrator of domestic violence. The prosecutor contrasted the "vague" language of subdivision (d)—" 'circumstances involving [domestic violence] . . .' "—with the language of section 12022.8 —providing an enhancement for one who personally inflicts great bodily injury "on any victim" in a violation or attempted violation of enumerated sexual offense statutes—and argued that "if the legislature wanted it to be a narrow, related-to-the-victim-type circumstances they would have so specified." The prosecutor argued that by using the "under circumstances involving" language in section 12022.7, subdivision (d), the Legislature was "protecting all those in and about the area that may feel the wrath of somebody who was actually committing an act of domestic violence upon another as defined in Section 13700, sub (b), and that would fully incorporate Mr. Moreno who, again was part and partial [*sic*] of that whole incident."

The trial court concluded that it saw "nothing in the language of that enhancement that would indicate that the great bodily injury must be sustained by either the perpetrator or the victim of domestic violence. Within the language itself simply talks about infliction of great bodily injury on a person under circumstances involving domestic violence. [¶] There's nothing to suggest that the violence has to be—that the GBI has to be sustained by people who are in domestic violence relationships. It's just during the course of that type of a crime, and there's no limitation on who the victim may be."

Accordingly, the jury was instructed pursuant to jury instruction number 41 as follows: "It is alleged in Count Two and Three that in the commission or attempted commission of the crimes therein described, the defendant personally inflicted great bodily injury on Edward Moreno under circumstances involving domestic violence. If you find defendant guilty of

violation of Penal Code section 245, assault with a deadly weapon, and/or Penal Code section 459 burglary, you must determine whether in the commission of said crime or crimes, defendant personally inflicted great bodily injury on Mr. Moreno under circumstances involving domestic violence. [¶] Great bodily injury means significant or substantial physical injury. Minor, trivial or moderate injury do not constitute great bodily injury. [¶] Domestic violence means abuse committed against an adult or spouse or person with whom the defendant has had a child. [¶] The People have the burden of proving this truth of this allegation as well. And if you have a reasonable doubt that it is true, you must find it to be not true."

■ "The constitutional interest implicated in questions of statutory vagueness is that no person be deprived of 'life, liberty, or property without due process of law,' as assured by both the federal Constitution (U.S. Const., Amends. V, XIV) and the California Constitution (Cal. Const., art. I, § 7). Under both Constitutions, due process of law in this context requires two elements: a criminal statute must ' "be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard for police enforcement and for ascertainment of guilt." ' (*Walker* v. *Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852]; see also *Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 908-909, 103 S.Ct. 1855].) [¶] We evaluate the specificity of the amendment according to the following standards: ' "Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' (*Cranston* v. *City of Richmond* (1985) 40 Cal.3d 755, 763 [221 Cal.Rptr. 779, 710 P.2d 845], quoting *Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108-109 [33 L.Ed.2d 222, 227-228, 92 S.Ct. 2294].)" (*Williams v. Garcetti* (1993) 5 Cal.4th 561, 567-568 [20 Cal.Rptr.2d 341, 853 P.2d 507], italics omitted.) " '[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential element of due process of law.' " (*People v. Deskin* (1992) 10 Cal.App.4th 1397, 1400 [13 Cal.Rptr.2d 391], quoting *Connally v. General Construction Co.* (1926) 269 U.S. 385, 391 [46 S.Ct. 126, 127, 70 L.Ed. 322].)

■ "The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality

clearly, positively, and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' (*Walker* v. *Superior Court, supra,* 47 Cal.3d at p. 143.)" (*Williams* v. *Garcetti, supra,* 5 Cal.4th 561, 568.) "Although a particular statute is somewhat vague or general in its language because of difficulty in defining the subject matter with precision, it will be upheld if its meaning is reasonably ascertainable." (*People* v. *Deskin, supra,* 10 Cal.App.4th at p. 1400.)

"In order to succeed on a facial vagueness challenge to a legislative measure that does not threaten constitutionally protected conduct . . . a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that 'the law is impermissibly vague in all of its applications.' (Italics added.) (*Hoffman Estates* v. *Flipside, Hoffman Estates* (1982) 455 U.S. 489, 497 [71 L.Ed.2d 362, 371, 102 S.Ct. 1186].)" (*Evangelatos* v. *Superior Court* (1988) 44 Cal.3d 1188, 1201 [246 Cal.Rptr. 629, 753 P.2d 585], italics omitted.)

 Appellant's vagueness challenge to section 12022.7, subdivision (d), is not clearly spelled out in his brief: After setting forth various standards for review of a vagueness challenge and defining the question as whether section 12022.7, subdivision (d), provides a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" (*Grayned* v. *City of Rockford, supra,* 408 U.S. 104, 108 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222, 227]), appellant argues simply that the scope of section 12022.7, subdivision (d), does not extend to third parties.

 " '[I]n construing a statute, a court [must] ascertain the intent of the Legislature so as to effectuate the purpose of the law.' (*People* v. *Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].) In determining that intent, we first examine the words of the respective statutes: 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." [Citation.] "Where the statute is clear, courts will not 'interpret away clear language in favor of an ambiguity that does not exist.' [Citation.]" ' (*Lennane* v. *Franchise Tax Bd.* (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].)" (*People* v. *Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].)

The language of section 12022.7, subdivision (d), does not limit its application to injuries inflicted upon the victim or perpetrator of domestic violence. As the prosecutor argued at trial, this is in contrast to section 12022.8, which establishes an enhancement for a defendant who personally inflicts great bodily injury "on any victim" in a violation or attempted violation of enumerated sexual offense statutes. It is also in contrast to subdivision (c) of section 12022.7, which describes an enhancement for a defendant who personally inflicts great bodily injury "on a person who is 70 years of age or older" in the commission of a felony. These statutes demonstrate that the Legislature is capable of limiting the reach of an enhancement statute quite precisely. In *People v. Miller* (1977) 18 Cal.3d 873 [135 Cal.Rptr. 654, 558 P.2d 552], the defendant was found to have inflicted great bodily injury on a security guard in the commission of a robbery. Section 213 at that time provided for increased punishment when a defendant, in the commission of a robbery, intentionally inflicted great bodily injury "on the victim of the robbery." (18 Cal.3d at pp. 879-880 and fn. 3.) On appeal, the increased penalty was found inapplicable because the security guard was not identified in the information as a victim of the robbery. (*Id.* at pp. 881-882.) The *Miller* court noted that for all that appeared in the information, the guard could have been a bystander accidentally injured during the robbery. (*Id.* at p. 881.) The court stated that it was clear "the Legislature did not intend to provide for an augmented penalty in the case of injury to persons who, unfortunately, are incidentally caught up in the events constituting the crime, as the statute expressly provides for its application upon great bodily injury to a 'victim' rather than to a 'person.'" (*Id.* at p. 881, fn. 5.)

The Legislature in section 12022.7, subdivision (d), could easily have limited application of the enhancement to great bodily injury inflicted upon a "victim of domestic violence." Instead, it chose the broad language "under circumstances involving domestic violence." This broadness does not render the statute either unconstitutionally vague or ambiguous: By its plain language, section 12022.7, subdivision (d), establishes an enhancement for any person who inflicts great bodily injury upon a person in the course of an incident of domestic violence. No person of ordinary intelligence would be left guessing as to the meaning of this language. Rather, the statute clearly informs a defendant who commits domestic violence that infliction of great bodily injury on any person involved in the incident, whether or not a victim of domestic violence under the definition of section 13700, will result in an enhanced sentence. It is easy to conjure the circumstances in which the statute might come into play, such as when the defendant inflicts great bodily injury upon a friend or relative who has attempted to come to the aid

of the domestic violence victim, or upon a peace officer responding to an incident of domestic violence. The reach of the statute certainly includes the circumstances presented here, in which an angry husband physically abuses his wife and, as part of the same incident, inflicts great bodily injury upon the man with whom she is having an affair.

Appellant argues that section 13700 has been interpreted to apply to acts of domestic violence committed by the same perpetrator against the same victim. *People v. Hoover* (2000) 77 Cal.App.4th 1020 [92 Cal.Rptr.2d 208], upon which appellant relies, upheld Evidence Code section 1109, which permits use of evidence of prior incidents of domestic violence in a current prosecution for a domestic violence offense. *Hoover* quoted the legislative history of Evidence Code section 1109, which stated: " 'The propensity inference is particularly appropriate in the area of domestic violence because on-going violence and abuse is the norm in domestic violence cases. Not only is there a great likelihood that any one battering episode is part of a larger scheme of dominance and control, that scheme usually escalates in frequency and severity. Without the propensity inference, the escalating nature of domestic violence is likewise masked. If we fail to address the very essence of domestic violence, we will continue to see cases where perpetrators of this violence will beat their intimate partners, even kill them, and go on to beat or kill the next intimate partner. Since criminal prosecution is one of the few factors which may interrupt the escalating pattern of domestic violence, we must be willing to look at that pattern during the criminal prosecution, or we will miss the opportunity to address this problem at all.' (Assem. Com. on Public Safety, Rep. on Sen. Bill No. 1876 (1995-1996 Reg. Sess.) June 25, 1996, pp. 3-4.)" *(People v. Hoover, supra,* 77 Cal.App.4th at pp. 1027-1028.)

*Hoover* provides no guidance on the interpretation of section 12022.7, subdivision (d). While appellant correctly concludes that the focus of the domestic violence statutes is on protection of the victims of domestic violence, this focus need not be viewed as exclusive—at least when the language of the statute does not impose a limitation to great bodily injury inflicted upon the victim of domestic violence. Rather, the language used by the Legislature—"under circumstances involving domestic violence"—appears to extend the sphere of protection against domestic violence by increasing penalties for a defendant who inflicts great bodily injury upon any person who is injured in the course of an incident of domestic violence.

## II.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

The judgment is affirmed.

Lambden, J., and Ruvolo, J., concurred.

.

.

---

*See footnote, *ante*, page 887.