Filed 2/10/25  P. v. Dixon CA1/5
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>JACQUELINE DIXON,<br><br>        Defendant and Appellant. | A167191<br><br>(Contra Costa County<br>Super. Ct. No. 05002007508) |

Appellant and defendant Jacqueline Dixon challenges the imposition of a five-year enhancement for the infliction of "great bodily injury under circumstances involving domestic violence" pursuant to Penal Code section 12022.7, subdivision (e).[1]  She contends that the enhancement does not apply because great bodily injury is also an element of her underlying conviction for mayhem.  She further contends that there is insufficient evidence to support the enhancement.  Subdivision (g) of section 12202.7, however, establishes that this particular enhancement applies even if the infliction of great bodily injury is an element of the underlying offense.  There is also ample evidence to support the jury's finding that Dixon inflicted great bodily injury in the course of a domestic violence incident that she initiated when she tried to run over her husband with her van.  We therefore affirm.

---

[1] All further statutory references are to the Penal Code.

1

# BACKGROUND

## A. The Charges and Special Allegations

An amended information charged Dixon with nine felonies: (1) attempted murder of Victoria Sims (§§ 664, 187, subd. (a); count 1); (2) mayhem against Sims (§ 203; count 2); (3) assault with a deadly weapon on Sims (§ 245, subd. (a)(1); count 3); (4) attempted murder of the husband Raymond Patrick Dixon (husband) (§§ 664, 187, subd. (a); count 4); (5) spousal abuse (§ 273.5, subd. (a); count 5); (6) assault with a deadly weapon on the husband (§ 245, subd. (a)(1); count 6); (7) child abuse against Jane Doe #1 (§ 273a, subd. (a); count 7); (8) child abuse against Jane Doe #2 (§ 273a, subd. (a); count 8); and (9) child abuse against Jane Doe #3 (§ 273a, subd. (a); count 9). As to counts 1 through 6, the amended information alleged that Dixon personally inflicted great bodily injury (GBI) under circumstances involving domestic violence (GBI enhancement) (§ 12022.7, subd. (e)) and used a deadly and dangerous weapon (§§ 12022, subd. (b)(1) or 969f). As to counts 1 through 3, the weapon was alleged to be a motor vehicle; as to counts 4 through 6, the weapon was alleged to be a knife. Finally, the amended information alleged numerous aggravating circumstances.

The case proceeded to a jury trial.

## B. Prosecution's Case

The People called multiple witnesses, including the husband, E.D. (the husband's mother), Sims (the husband's niece and E.D.'s granddaughter), and Jane Doe #1 (Dixon's daughter).

### 1. *Dixon, the Husband, and the Children*

Dixon and the husband married in 2010 and have four children together, including Jane Doe #3 and Jane Doe #2. Dixon also has two

2

children from a prior relationship:  Josiah and Jane Doe #1.  The husband is six feet four inches tall and weighs over 300 pounds.

In November 2019, the husband served Dixon with divorce papers.  He also sought a restraining order against Dixon that was denied.  Dixon, in turn, sought a restraining order against the husband—which was also denied.

### 2.  *Prior Incidents of Domestic Violence*

Dixon and the husband had a history of domestic violence.  In 2017, they argued at their home, and the husband left.  When he returned, Dixon had packed his stuff and left it on the driveway.  The husband confronted Dixon and shoved her.  She then slapped him, causing his glasses to fall off his face.  In response, the husband hit Dixon.  Dixon called the police, and the police arrested both Dixon and the husband.

Another incident occurred on the day that the husband served divorce papers on Dixon.  Before the papers were served, Dixon and the husband argued in front of the children at their home.  As the husband drove away with the children, Dixon struck the car.  She also threatened to call the police and accused the husband of "kidnapping the kids."  The husband called 911, and the police concluded that no crime had been committed.  Eventually, the husband returned the children to Dixon.

In February 2020, the husband went to their former home (Dixon and the husband were now living apart) to see Jane Doe #2 on her first birthday.  At that time, Dixon was living with her six children, including her four children with the husband, her friend and her five children, "and some other guys."  A couple of days earlier, the husband became upset because he discovered that Dixon had taken some tax refund money that he believed belonged to him.  When the husband arrived at the home "unannounced," he

discovered that most of his belongings had been "destroyed." He became angry, flipped a table over in the garage, and left.

On April 11, 2020—two days before Dixon's birthday—the husband took their four biological children to stay with him. Between then and May 10, 2020 (Mother's Day), the husband only allowed Dixon to see the four children twice.

3. *The Mother's Day Incident*

In May 2020, the husband was living with his and Dixon's four biological children at a friend's house in Antioch. He agreed to allow Dixon to see the children at E.D.'s apartment, a "neutral" location, on Mother's Day. On that day, the husband brought the children to E.D.'s apartment in the late afternoon or early evening. Sims, who was living with E.D. at the time, was also there.

The husband and Sims left together in E.D.'s car. Soon after, Dixon arrived at E.D.'s apartment with Jane Doe #1, who was 12 at the time, to see the other four children.

The husband and Sims returned to E.D.'s apartment a couple of hours later. Dixon, the husband, and Jane Doe #1 then stepped into the hallway outside the apartment to talk. Dixon asked the husband when she could "have the kids back." When the husband refused to return the children, he and Dixon began yelling at each other.

Due to the commotion, E.D. went into the hallway and asked Dixon and the husband to be quiet. The husband re-entered E.D.'s apartment, while Dixon continued yelling at him from the hallway. E.D. again asked Dixon to be quiet, but Dixon responded by threatening that she was "going to get [E.D.] put out."

4

Dixon eventually left E.D.'s apartment building with Jane Doe #1, and they walked to Dixon's van. E.D. and Sims followed them. Dixon stood by the driver's seat with the door open, and Jane Doe #1 was by the front passenger seat.

E.D. asked Dixon to leave. Meanwhile, Sims and Dixon yelled at each other. Sims told Dixon that she was "tired" of how Dixon treated the husband and E.D.; Dixon told Sims to "shut up little girl" and threw a water bottle at E.D.'s car. Sims called Dixon "the B word" and invited her to fight. Dixon then threatened to "beat [Sims's] ass."

The husband also left E.D.'s apartment to confront Dixon. He came up behind E.D. and Sims and told Dixon that he did not like how she was talking to Sims. Dixon then began arguing with the husband.

Eventually, Dixon—who was visibly angry—got into her van, which had been parked facing E.D.'s car. At Dixon's request, Jane Doe #1 got into the front passenger seat. At that point, there had been no physical contact between Dixon and the husband, E.D., or Sims.

Dixon backed up the van, made a U-turn, and accelerated towards the husband, E.D., and Sims. Jane Doe #1 and Sims testified that Dixon tried "to hit" or "run over" the husband, as well as E.D. and Sims. After Dixon almost hit him, the husband struck the van's driver side mirror.

Meanwhile, Sims tried to run away. Dixon, however, drove "really fast," jumped a curb, struck Sims, and pinned her against a tree.

Jane Doe #1, who testified that Dixon purposely hit Sims, hit her head against the windshield. Jane Doe #1 then "squeeze[d]" out of the van. Meanwhile, Dixon backed up, made another U-turn, started driving towards E.D. and Jane Doe #1, and eventually hit E.D.'s car.

5

At some point, the husband, who was enraged and wanted "to beat [Dixon] up," pulled Dixon out of the van by her hair.[2]  After Dixon fell to the ground, the husband testified that he froze and that Dixon got back into her van.  Jane Doe #1, however, testified that Dixon and the husband began "wrestling" with each other.

Eventually, Dixon pulled out a knife.  Jane Doe #1 testified that she knocked the knife out of her hand.  Jane Doe #3—who was "9 or 10" and holding Jane Doe #2, who was one at the time—ran out of the apartment and yelled at Dixon to stop.  Jane Doe #1 took Jane Doe #2 from Jane Doe #3 and handed her to the husband.

At some point, Dixon grabbed the back of the husband's shirt, and he "threw her to the ground."  The husband then fell on his back while holding Jane Doe #2.  Jane Doe #1 picked up Jane Doe #2 and ran to the sidewalk with her.

During their tussle, Dixon stabbed the husband with her knife.  He suffered an 8-inch laceration to his left thigh and a 14-centimeter laceration across his back.

Sims suffered more severe injuries.  She "had a major crush injury across her pelvis and her thigh," including "an open pelvis" and "femur fracture."  In addition, "her leg was ripped open."  As a result, she had to undergo multiple surgeries, including a leg amputation, and stayed in the hospital for six weeks.  At the time of trial, Sims still used a colostomy bag, and her sexual organs remained compromised.

**C. Defense Case**

Three witnesses, including Dixon herself, testified in her defense.

---

[2] There appeared to be some confusion over when the husband pulled Dixon out of her van.

1. *Josiah*

Josiah, Dixon's son who was 16 at the time of trial, testified that when Dixon and the husband argued, there would be "banging" and "holes in the wall." He also saw the husband flip tables and heard the husband call Dixon "the B word." One time, Josiah heard the husband tell Dixon that he didn't care if "a bunch of dudes" had sex with her. Finally, Josiah testified that he was scared that the husband would harm Dixon.

2. *Dixon*

Dixon testified that the husband started to call her names and ask for sexual acts that she did not want to perform after five years of marriage. According to Dixon, the husband did not want her "to have any friends outside the marriage." And before 2017, the husband would punch holes in walls, flip tables, and knock doors off hinges during their arguments.

As for the 2017 incident, Dixon initially testified that she pushed the husband and that he responded by slapping her. As a result, Dixon's glasses fell off, and she fell to the floor. Dixon later clarified that the husband pushed her first. She then slapped him, and he slapped her back. The husband also threatened to "beat [her] ass." Dixon called the police, who arrested Dixon. This was the first time the husband had hit her.

On the day that the husband served her with divorce papers, Dixon testified that he left with five of the children, including their four biological children. Dixon called the police, who directed her "to family court." The husband returned the children about a week later.

Dixon also testified about the incident that occurred on Jane Doe #2's first birthday. According to Dixon, the husband became "enraged" when he discovered that she had "destroyed" his property. He flipped a table in the

7

garage, called Dixon a "crack ass bitch," and threatened Dixon's friend. Dixon also talked about shooting the husband.

According to Dixon, the husband took their four biological children a couple of days before her birthday in April 2020. Over the next few weeks, she saw the children once. When Dixon asked the husband when she "was going to get the kids back," he refused to answer.

On Mother's Day, Dixon testified that she went to E.D.'s apartment to see their four children. When the husband returned to the apartment, Dixon asked to speak with him in the hallway outside the apartment. The husband told her that he was not going to return the children, and they began yelling at each other. E.D. came out and asked them to be quiet. After the husband threatened to "beat [her] ass," Dixon, who was "shaking," left and went to her van with Jane Doe #1.

According to Dixon, E.D. and Sims followed her to her van. Dixon admitted that she threw a water bottle at E.D.'s car and that she and Sims yelled at each other. Dixon called Sims "a little girl," and Sims threatened to "whoop [her] ass." Dixon testified that the husband, who was visibly angry, came out and hit her in the head, causing her glasses to fall off. As a result, Dixon could not see "much at all."

Dixon testified that she called 911 right before she started driving her van because the husband had hit her and because she was scared of him. Jane Doe #1 sat in the front passenger seat. As Dixon drove away, the husband hit the side view mirror. According to Dixon—who was driving without her glasses—she made a U-turn so she wouldn't hit anybody. She testified that she tried to brake but accidentally "hit the gas," jumped the curb, and hit a tree. She did not see anybody in front of her van. When she backed up, she heard people yelling that she "hit her" but did not "realize

8

that [she had] hit anyone" at that time. She later saw Sims laying on the ground "bloody." Dixon testified that she did not "mean to hit" Sims.

After Dixon hit E.D.'s car, she testified that the husband, who was "very upset" and screaming at her, pulled her out of the van by her hair and began hitting her. Dixon fought back, but the husband, who was much larger, "had the upper hand." When the husband stood up, Dixon, who was "scared for [her] life," pulled out a knife from her bra and stabbed him in the back and leg. As the husband walked away, she went to her van and waited for the police.

### 3. *Dr. Laura Barnard*

Dr. Barnard testified as "an expert on intimate partner battery and its [effects]" and "traumatic stress and its [effect] on memory." She opined that Dixon was "a battered woman," who suffered from "fairly extreme" abuse. As a result, Dixon's memory of incidents may become "jumbled up." Dr. Barnard also testified that, based on the escalating events on Mother's Day, Dixon, as a battered woman, likely feared for her life, even when she stabbed her husband after he stood up. She also opined that Dixon's decision to call 911 suggested that she was not the "aggressor."

### D. The Verdict and Sentence

The jury acquitted Dixon of the attempted murders (§§ 664, 187, subd. (a)) of Sims (count 1) and the husband (count 4) and two counts of felony child abuse (§ 273a, subd. (a); counts 8 and 9).

The jury, however, found Dixon guilty of: (1) attempted voluntary manslaughter of Sims (§§ 664, 192, subd. (a)), a lesser included offense of attempted murder (count 1); (2) mayhem against Sims (§ 203; count 2); (3) assault with a deadly weapon on Sims (§ 245, subd. (a)(1); count 3); (4) felony child abuse against Jane Doe #1 (§ 273a, subd. (a); count 7); and

9

(5) misdemeanor child abuse against Jane Doe #3 (§ 273a, subd. (b)), a lesser included offense of felony child abuse (count 9).  As to the three counts where Sims was the victim, the jury found that Dixon inflicted GBI under circumstances involving domestic violence (§ 12022.7, subd. (e)) and used a deadly weapon (motor vehicle) (§§ 12022, subd. (b)(1) or 969f).

The jury was unable to reach a verdict as to the remaining three counts where her husband was the alleged victim:  (1) attempted voluntary manslaughter (§§ 664, 192, subd. (a); count 4); (2) spousal abuse (§ 273.5, subd. (a); count 5); and (3) assault with a deadly weapon (§ 245, subd. (a)(1); count 6).  The trial court declared a mistrial as to those counts and dismissed them pursuant to the People's motion.

The trial court sentenced Dixon to 13 years in state prison by imposing the upper term of eight years on her mayhem conviction (count 2) plus five years for the GBI enhancement.  It also stayed the sentences as to the attempted involuntary manslaughter (count 1) and assault with a deadly weapon (count 3) convictions pursuant to section 654 and ran the sentences as to the child abuse convictions (counts 7 and 9) concurrently.  Dixon timely appealed.

## DISCUSSION

### A.  Double Punishment

Dixon contends that the trial court erred by imposing the GBI enhancement pursuant to section 12022.7, subdivision (e) because GBI is an element of both the enhancement and the underlying offense of mayhem.  Section 12022.7, subdivision (g), however, establishes otherwise.

The rules of statutory construction are well established.  If the statutory language is unambiguous, then " 'the plain meaning of' " that

language controls and we need look no further. (*Pineda v. Williams-Sonoma Stores, Inc.* (2011) 51 Cal.4th 524, 530.) But if the language is ambiguous, then we may consider the canons of statutory construction in interpreting the statute. (*Carmack v. Reynolds* (2017) 2 Cal.5th 844, 850.) "The interpretation of statutory language is . . . subject to our de novo review." (*MES Investments, LLC v. Dadson Washer Service, Inc.* (2020) 56 Cal.App.5th 451, 458.)

Subdivisions (a) through (e) of section 12022.7 establish different enhancements based on the infliction of GBI. The one at issue here—found in subdivision (e)—states in relevant part: "Any person who personally inflicts great bodily injury under circumstances involving domestic violence in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three, four, or five years." Subdivision (g) then states that the GBI enhancements found in "[s]ubdivisions (a), (b), (c), and (d) [of section 12022.7] shall not apply if infliction of great bodily injury is an element of the offense." It, however, omits subdivision (e) from the list of enhancements that do not apply in that circumstance.

Because subdivision (g) created a "specific list" of GBI enhancements found in section 12022.7, the omission of subdivision (e) from that list must be "intentional." (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.) And that intentional omission means that the Legislature did not intend to include subdivision (e) among the enhancements that do not apply when GBI is also an element of the underlying offense. (See *Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 116 ["where

11

exceptions to a general rule are specified by statute, other exceptions are not to be presumed unless a contrary legislative intent can be discerned"].)

In her reply brief, Dixon does not challenge this reasoning. Instead, she contends for the first time that, notwithstanding section 12022.7, subdivision (g), imposing the enhancement violates section 654 because she is being punished twice "for the same act or omission."[3] But "[t]hat argument has been forfeited." (*People v. Saucedo* (2023) 90 Cal.App.5th 505, 514.)

In any event, section 12022.7, subdivision (g)—which only applies when a defendant inflicts GBI—is more specific than section 654—which applies to any act or omission. (See *People v. Billy* (2024) 107 Cal.App.5th 246, 264 ["A statute is general when its subject matter encompasses hundreds of situations, while a statute is specific if its subject matter applies to a specific class of crimes or a single type of conduct"].) Recourse to section 654 is therefore "unnecessary," and "[t]he court should simply apply the answer found in the specific statutes and not consider the more general section 654." (*People v. Ahmed* (2011) 53 Cal.4th 156, 163.) Section 12022.7, subdivision (g) establishes that subdivision (e) applies even if GBI is an element of the underlying offense. Accordingly, the trial court was free to apply section 12022.7, subdivision (e) here.

---

[3] Section 654, subdivision (a) states: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

## B. Sufficiency of the Evidence

Dixon contends that there is insufficient evidence to support the jury's finding that she inflicted GBI "under circumstances involving domestic violence" pursuant to section 12022.7, subdivision (e). In considering a challenge to the sufficiency of the evidence, we "review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).) Viewing the evidence in that light, we find more than sufficient evidence to support the jury's finding.

Under section 12022.7, subdivision (e), the enhancement applies only if the defendant inflicts GBI "under circumstances involving domestic violence." " 'Domestic violence' means abuse committed against an adult or a minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the suspect has had a child or is having or has had a dating or engagement relationship." (§ 13700, subd. (b).) And " '[a]buse' means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another." (*Id.*, subd. (a).)

For GBI to occur "under circumstances involving domestic violence," the injury must occur "in the course of an incident of domestic violence." (*People v. Truong* (2001) 90 Cal.App.4th 887, 899 (*Truong*).) The injury may be inflicted "on any person involved in the incident, whether or not a victim of domestic violence . . . ." (*Ibid*.) Thus, the enhancement may apply "when the defendant inflicts [GBI] upon a friend or relative who has attempted to come

13

to the aid of the domestic violence victim" or when "an angry husband physically abuses his wife and, as part of the same incident, inflicts [GBI] upon the man with whom she is having an affair." (*Id*. at pp. 899-900.)

When the evidence is viewed in the light most favorable to the jury's finding, the domestic violence incident began when, as Jane Doe #1 and Sims testified, Dixon tried to run over the husband with her van.[4] Shortly after she failed to hit the husband, Dixon seriously injured Sims—who had just been defending the husband and who the husband had just been defending against Dixon—by pinning Sims against a tree with the van. Thus, there is ample evidence that Dixon inflicted GBI upon Sims in the course of this incident of domestic violence. Indeed, Sims is no different than the boyfriend of the defendant's spouse in *Truong*, who "fe[lt] the wrath of somebody who was actually committing an act of domestic violence upon another . . . ." (*Truong*, *supra*, 90 Cal.App.4th at p. 896.)

Dixon counters that she injured Sims because of their verbal spat and not as part of any domestic violence incident. Even if this interpretation of the evidence is plausible, we must view that evidence in the light most favorable to the jury's findings. (*Albillar*, *supra*, 51 Cal.4th at pp. 59-60.) In any event, the record indicates that Dixon likely became angry with Sims right before she hit Sims with her van because Sims was defending the husband. Thus, the evidence in support of the enhancement is even stronger than in *Truong*, where the defendant stabbed his spouse's boyfriend while he was sleeping. (*Truong*, *supra*, 90 Cal.App.4th at pp. 893, 900.)

---

[4] The jury was free to disbelieve Dixon's testimony that the husband threatened and struck her before she tried to run him over.

Dixon also contends that, because the jury deadlocked on the three counts where the husband was the alleged victim—including the count for spousal abuse—the jury did not find that Dixon committed any abuse. But these three counts—which alleged that Dixon personally used a knife as an element of the offense or the enhancement to the offense—did not cover Dixon's attempt to run over the husband. Thus, the jury's inability to reach a verdict on those counts has no bearing on its finding that Dixon inflicted GBI on Sims "under circumstances involving domestic violence." (§ 12022.7, subd. (e).)

Finally, Dixon contends that the enhancement should not be imposed because she was the victim, and not the perpetrator, of domestic violence in this instance. The jury, however, could have found otherwise based on Dixon's attempt to run over the husband. Because we must presume " ' "the existence of every fact the trier could reasonably deduce from the evidence" ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550), we presume that the jury did so here.

Accordingly, we find sufficient evidence to support the enhancement.

C.     **Abstract of Judgment**

Both parties agree that certain errors in the abstract of judgment (abstract) should be corrected. We too agree.

First, the abstract lists the statutory basis for the personal use of a deadly weapon enhancements (deadly weapon enhancement) as section 12022, subdivision (e)(1). But that subdivision does not exist. Instead, the correct subdivision is subdivision (b)(1), and the abstract should be corrected to fix this error.

15

Second, the abstract states that a deadly weapon enhancement (mistakenly listed as "PC 12022(e)(1)") was alleged, imposed, and stayed as to count 3. But count 3 only alleged the use of a deadly weapon as a "Special Allegation" under section 969f, making it a serious or violent felony. And in its oral pronouncement of judgment, the trial court did not impose or stay any deadly weapon enhancement as to count 3. "Where there is a discrepancy between the oral pronouncement of judgment and . . . the abstract of judgment, the oral pronouncement controls." (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385 (*Zackery*).) The deadly weapon enhancement as to count 3 should therefore be deleted.

Third, the abstract states that the trial court stayed, rather than struck, the deadly weapon enhancement as to count 1. But in its oral pronouncement of judgment, the court struck that enhancement. Again, the oral pronouncement controls, and the abstract should be conformed to it. (*Zackery*, *supra*, 147 Cal.App.4th at p. 387.)

Finally, the abstract states that Dixon was sentenced under section 667, subdivisions (b) through (i) or section 1170.12 based on a "strike prior." Dixon, however, had no prior strikes. The reference in the abstract to any prior strike should therefore be deleted.

Accordingly, we order that the abstract be corrected and conformed "to the sentences actually imposed by the court" in the manner described above. (See *People v. Myles* (2012) 53 Cal.4th 1181, 1222, fn. 14.)

## DISPOSITION

The trial court is directed to prepare an amended abstract of judgment as described above.  The judgment is affirmed in all other respects.  The trial court is further directed to forward a certified copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation.


CHOU, J.


We concur.


JACKSON, P. J.
BURNS, J.


(A167191)