[No. A122651. First Dist., Div. One. Feb. 9, 2010.]

In re NOREEN G. et. al., Minors.
RONALD R. et al., Petitioners and Appellants, v.
JAMIE R. et al., Objectors and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part I of the Discussion, Appeals of the Parents.

**COUNSEL**

Fishel and Fishel and James J. Fishel for Petitioners and Appellants.

Seth F. Gorman, under appointment by the Court of Appeal, for Objector and Appellant Jamie R.

Mary R. Williams, under appointment by the Court of Appeal, for Objector and Appellant Raymond G.

**OPINION**

**DONDERO, J.**—Two appeals have been taken from a judgment that granted a petition brought pursuant to Probate Code section 1516.5 (section 1516.5), to declare two minors, Emma and Noreen, free from the care, custody, and control of their biological mother and father, Raymond and Jamie, and granted the parents visitation rights.[1] The parents claim in their appeal that section 1516.5 is impermissibly vague and violates due process. They also argue that the minors were denied right to counsel in the case, an investigator's report was not properly submitted, the evidence fails to support the termination of their parental rights, and the court failed to comply with the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). The guardians of the minors, Juliana and Ronald, who filed the petition, have also appealed from the court's visitation order, in which they claim that the visitation rights granted to the parents were beyond the authority of the trial court and an abuse of the court's discretion.

We find that section 1516.5 does not have any constitutional infirmities, no denial of the right to counsel occurred, any deficiencies in the investigator's report were not prejudicial to the parents, and the evidence amply supports the termination of parental rights. We conclude that we must make a limited remand of the case to the trial court to comply with the inquiry provisions of the ICWA. We also conclude that the order granting visitation rights to the parents must be reversed as in excess of the trial court's authority.

---

[1] For the sake of confidentiality and clarity, we will refer to the parties, including the minors, individually by their first names; we will also refer to the biological parents of the minors, Jamie and Raymond, individually as mother and father and collectively as objectors or the parents; we will refer to petitioners Juliana and Ronald collectively as petitioners or the guardians.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

The minor Emma was born in May of 2002; her sister Noreen was born in May of 2003. Jamie is the biological mother of the minors. Raymond and Jamie were married in 2002, and he is the presumed father of the minors, although his paternity of Emma has not been established. At the request of Jamie, in August of 2004 the minors began temporarily residing with petitioners Ronald and Juliana, their maternal uncle and aunt. Jamie was seeking treatment for a chronic substance abuse problem, and her relationship with Raymond was volatile, physically abusive, and intermittent.[2] Raymond also has a history of drug and alcohol addiction. In September of 2004, again with the approval of Jamie, petitioners were appointed the legal guardians of the minors.[3]

Within a month, the guardianship became a contentious matter between Jamie and petitioners, and has remained so. In October of 2004, Jamie filed a petition to terminate the guardianship based on accusations against petitioners that were not substantiated; the petition was denied. Subsequent petitions filed by Jamie to terminate the guardianship were also denied. Jamie continued to engage in visitation with the minors, but did not follow through with drug and alcohol rehabilitation efforts.

In April of 2005, petitioners filed a motion to terminate visitation by the parents based upon an accusation made by Emma that she was sexually molested by Raymond during an overnight visit with Jamie. The accusation was not prosecuted due to Emma's young age and lack of physical evidence of abuse, but Raymond was arrested on unrelated outstanding warrants and taken to Nevada, where he was subsequently incarcerated in state prison until September of 2007. On April 25, 2005, unsupervised visitation with the minors was suspended pending an investigation. In May of 2005, Juliana obtained a restraining order that compelled Raymond to stay away from her residence and prohibited him from any contact with Emma or Noreen.[4] Raymond has neither had any contact with the minors nor sought visitation with them since April of 2005.

---

[2] On one occasion Raymond was arrested after physically assaulting Jamie, but the charges were subsequently dropped at Jamie's request.

[3] Raymond apparently voiced opposition to the guardianship, but did not appear at the hearing to contest it.

[4] The restraining order was later extended, and is effective until May of 2011.

By August of 2005, Jamie's unsupervised visitation with the minors was increased. Her drug tests were negative and she was attending domestic violence classes. In February and August of 2006, at the request of counsel for the minors the court further expanded Jamie's visitation rights to include a portion of six days a week and three overnight stays per week, or a time-share with the guardians of between 50 and 55 percent. Jamie was directed to complete a parenting class prior to filing for termination of the guardianship. The minors' counsel recommended termination of the guardianship in February of 2007.

By March of 2007, however, Emma was diagnosed with an adjustment disorder caused by the visitation arrangement that resulted in frequent transitions between the homes of the guardians and Jamie. The guardians also accused Jamie of at least one instance of alcohol and drug use—based on a report from the father of one of Jamie's older children (not involved in these proceedings)—although Jamie denied any relapse into illegal drug use, and a drug test was negative.

Jennifer Emerson, a registered child-parent therapist with the Early Childhood Mental Health Program, was appointed by the court to evaluate the minors and provide family therapy. She observed that on several occasions Jamie suffered injuries that included a black eye and serious abrasions or bruises on her arms. Emerson suspected from Jamie's evasive answers to inquiries about the source of the injuries that Jamie was being abused by her boyfriend Scott Armas. Then in August of 2007, Emma reported to Emerson that during overnight visitation the minors repeatedly witnessed acts of physical abuse committed upon Jamie by her boyfriend. Both Emma and Noreen stated that they periodically observed Jamie and Armas hitting each other, which frightened and upset them. When Emerson confronted Jamie with the issue of domestic violence in the home that had been witnessed by the minors, Jamie became "very angry" and asked Emerson to leave, although she did acknowledge to Emerson that some "incidents of violence in the home" had occurred.

Also in August of 2007, Emerson and Juliana observed bruises on Emma's lower left side that were in the shape of a belt or waistband. Emma claimed that after she hit her mother Jamie struck her "really hard."[5] Jamie at first denied that Emma's injury occurred as a result of infliction of physical abuse. She subsequently acknowledged that she hit Emma "back" in anger after Emma hit her, and expressed that she was "justified in doing it."

---

[5] Noreen subsequently corroborated her sister's claim of abuse.

A Child Protective Services (CPS) investigation was commenced, Jamie's petition for termination of the guardianship was denied, and unsupervised visitation was suspended pending completion of the investigation. Emerson advised CPS that unsupervised visits by Jamie with the children were no longer appropriate,.and CPS agreed. Dr. Joseph Bongiovanni was assigned to conduct the CPS guardianship investigation of the welfare of the minors. He described the minors as "normal," well adjusted and "happy" in the home of the guardians. Dr. Bongiovanni, concluded in his investigative narrative that Jamie was not committing ongoing abuse, but he found a "[s]ubstantial risk" to the children in the mother's home due to the domestic violence between her and Armas. According to Dr. Bongiovanni, "no foundation" existed for CPS to file a dependency petition. He also thought the children were adequately protected by the existing guardianship and the ability of the probate court to intercede on behalf of the children.

On September 7, 2007, by stipulation the unsupervised visits with the minors by Jamie as specified in prior visitation orders were suspended in favor of supervised visitation only, twice a week for two hours per visit. Following the stipulated supervised visitation order, Jamie visited with the minors only four times. Jamie ended her relationship with Armas in September of 2007.

The present petition to terminate the objectors' parental rights was filed by the guardians on January 10, 2008. After the petition was filed, Jamie left a succession of harassing, threatening and somewhat irrational telephone messages to petitioners in April of 2008, in which she implored Juliana to abandon the proceedings. Tape recordings of these messages were played during the hearing before the trial court. On April 17, 2008, Jamie was observed by Juliana pacing outside the guardians' home. Thereafter, Juliana obtained a restraining order against Jamie.

Trial on the petition was held in June of 2008. Juliana testified that she and Ronald decided to file the petition due to the "dramatic improvement in Emma's symptoms" of anxiety after unsupervised visitation with Jamie was terminated, the lack of progress made by Jamie, and the detriment to the children from the instability caused by the continued guardianship. Juliana indicated that she and Ronald brought the petition for termination of parental rights to relieve the minors' anxiety and instability that has occurred with the long, protracted and bitterly contested guardianship. She testified that the prolonged guardianship and associated confusion "is hurting the children." According to Juliana, the objective of the petitioners is to adopt the children

upon the termination of parental rights. Juliana agreed that the minors have an attachment to their mother and want to visit her, but testified that their primary need is to reach an end to the litigation and obtain a stable, permanent home through adoption.

Rose Parson, a court investigator for the Contra Costa County Superior Court, testified that in February of 2008 she was assigned by the court to investigate the guardianship and submit a report. She reviewed the guardianship file, including the letters and reports from Jennifer Emerson, and visited the home of the guardians on March 3, 2008, where she interviewed them and the minors. Parson found that the minors and the guardians have a loving parent-child relationship. Emma disclosed to Parson that she "likes living with the petitioners, but also likes . . . staying at her mother's home." When asked by Parson about staying at her mother's home Noreen responded, "it's dangerous."

In February of 2008, Parson also unsuccessfully attempted to contact and interview Jamie, both by sending her letters by certified mail to two purported addresses for her, and repeatedly calling a telephone number provided by the guardians.[6] Parson was not able to interview either Jamie or Raymond, and did not observe Jamie interact with the minors. According to the investigative report filed by Parson in March of 2008 and her testimony at trial, petitioners' home is the "only stable home environment" the minors have known since August of 2004. Parson found that petitioners made a "compelling argument why it is in the minors' 'best interest' to terminate parental rights at this time," but deferred offering a formal recommendation and suggested in her report that the court not rule on the petition until after a hearing. Parson also testified that if she were aware of a recommendation of Emerson to terminate parental rights, she "would probably be inclined" to make the same recommendation to the court. Parson was cross-examined by counsel for the parents.

Emerson testified at trial that in March of 2007 she diagnosed Emma with adjustment disorder with mixed aggression and anxiety. She thereafter began to provide counseling services to the minors and Jamie. Emerson found in her assessment of the minors that they particularly suffered during transitions between the homes of the guardians and Jamie. Emma demonstrated a pronounced increase in symptoms of anxiety and depressive disorder immediately following visits with Jamie. Emerson testified that although Emma loves

---

[6] One of the addresses was the one given by Jamie in the most recent petition to terminate the guardianship. Jamie testified that she would "skip" payment of her phone bill and the phone would be "shut off a couple of days," so no one could reach her.

Jamie and wants to continue to see her, she exhibited "a tremendous amount of relief" and an extensive improvement in her functioning when away from her mother. Emerson concluded that Emma "would face significant risk to her social, emotional, behavioral, and intellectual development" if she is returned to her mother. The risks associated with insecure or disorganized attachment such as characterized by the relationship of the minors with their mother range from "mild social, emotional, and behavioral impairment to more serious problems such as substance abuse, mental illness, delinquency and domestic violence." According to Emerson, the minors are confused and anxious about "where they are going to be living long-term." Emerson offered the firm opinion that termination of parental rights is in the best interests of the minors to provide them with the necessary stable and secure home.

Jamie testified that she has not used alcohol or illegal drugs since April of 2006. She has been tested often for drugs or alcohol, and has not been advised of any positive test results. Jamie admitted that for the last two years she has been addicted to Vicodin, which she began taking for pain in her hands and arms. Her doctor is attempting to "wean" her off Vicodin by prescribing lower doses of the drug for her. Jamie described her most recent visits with the minors as "happy and loving." Her goal is to terminate the guardianship and reunify with the minors.

Following the trial, the court found in a commendably thorough and extensive statement of decision that clear and convincing evidence "supports the presumption that parents are now unfit to properly care for the minors and that it would be detrimental to the minors not to terminate parental rights." The court further found "by clear and convincing evidence" that the minors will benefit from adoption by the guardians, and their "best interests" will be achieved by termination of parental rights. The court therefore ordered the termination of parental rights of both Jamie and Raymond pursuant to section 1516.5, but granted supervised visitation to them. The parents have appealed from the judgment terminating their parental rights; the guardians have separately appealed from the order granting the parents visitation.

## DISCUSSION

*The Appeals of the Parents*

I. *The Due Process Challenge to Section 1516.5.*\*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

\*See footnote, *ante*, page 1359.

II. *The Vagueness Challenge to Section 1516.5.*

We turn our attention to Jamie's complaint that section 1516.5 is impermissibly vague.[8] She specifically challenges the " 'physical custody' prong" of the statute, which she contends "fails to give a parent adequate notice as to what actions he or she must take to avoid the termination of his or her parental rights." Jamie maintains that the "physical custody" element of section 1516.5 is not further defined or detailed in the statute, and may be subject to "various interpretations." She points out that the term "physical custody" may have a wide range of "meanings," from "sole custody" to "any custody" by the guardians, which is not clarified in the legislative history of the statute or by reference to other sources. Jamie argues that without any definitive "knowledge of the scope of the statute," she "could not have properly evaluated the consequences of agreeing to a general guardianship" with petitioners. She therefore claims that section 1516.5 did not afford her with "fair warning" or "adequate notice of the conduct" which might subject her to deprivation of her fundamental parental rights, in violation of the tenets of substantive due process.

■ " 'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions [and requirements] are not clearly defined.' " (*Mason v. Office of Admin. Hearings* (2001) 89 Cal.App.4th 1119, 1126 [108 Cal.Rptr.2d 102].) Under the federal Constitution (U.S. Const., 5th & 14th Amends.) and the California Constitution (Cal. Const., art. I, § 7), substantive due process of law in the context of vagueness requires two elements: a statute must be definite enough to provide (1) a standard of conduct for those whose activities are proscribed and (2) a standard or guide against which conduct can be uniformly judged by courts. (*Kolender v. Lawson* (1983) 461 U.S. 352, 357 [75 L.Ed.2d 903, 103 S.Ct. 1855]; *Walker v. Superior Court* (1988) 47 Cal.3d 112, 141 [253 Cal.Rptr. 1, 763 P.2d 852]; *People v. Truong* (2001) 90 Cal.App.4th 887, 897 [108 Cal.Rptr.2d 904].)

■ "[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890 [55 Cal.Rptr.3d 716, 153 P.3d 282].) " ' "The void-for-vagueness doctrine reflects the principle that 'a statute which either forbids or requires the doing of an

---

[8] We note that Jamie did not allege in the trial court that the statute is vague, and in fact agreed that the physical custody prong of section 1516.5 was not in issue in the case. Despite her failure to object below, Jamie's challenge to the statute on the ground of unconstitutional vagueness or overbreadth presents a pure question of law that is capable of resolution without reference to the evidence adduced at trial, and thus has not been forfeited. (See *In re P.C.* (2006) 137 Cal.App.4th 279, 287 [40 Cal.Rptr.3d 17].)

act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.' [Citation.] The requirement that government articulate its aims with a reasonable degree of clarity ensures that state power will be exercised only on behalf of policies reflecting an authoritative choice among competing social values, reduces the danger of caprice and discrimination in the administration of the laws, enables individuals to conform their conduct to the requirements of law, and permits meaningful judicial review." [Citation.]' [Citation.]" (*People ex rel. Brown v. iMergent, Inc.* (2009) 170 Cal.App.4th 333, 339 [87 Cal.Rptr.3d 844].) " ' " 'A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it. [Citations.]' " [Citations.] However, "[a] statute is not vague if, as here, any reasonable and practical construction can be given to its language. Reasonable certainty is all that is required. [Citations.]" [Citations.]' [Citation.]" (*American Liberty Bail Bonds, Inc. v. Garamendi* (2006) 141 Cal.App.4th 1044, 1066 [46 Cal.Rptr.3d 541].)

■ "The Supreme Court has articulated two guiding principles for evaluating vagueness claims. 'The first principle is derived from the concrete necessity that abstract legal commands must be applied in a specific context. A contextual application of otherwise unqualified legal language may supply the clue to a law's meaning, giving facially standardless language a constitutionally sufficient concreteness. Indeed, in evaluating challenges based on claims of vagueness, the [United States Supreme Court] has said "[t]he particular context is all important." [Citation.]' [Citation.] Such context, our high court has observed, properly includes the purpose or objectives that the challenged law was designed to serve. [Citations.] [¶] 'The second guiding principle is the notion of "reasonable specificity" [citation] or " ' "[r]easonable certainty." ' " [Citations.] . . . "[F]ew words possess the precision of mathematical symbols, most statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity with which legislators can spell out prohibitions. Consequently, no more than a reasonable degree of certainty can be demanded. Nor is it unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." [Citation.]' [Citation.]" (*Amaral v. Cintas Corp. No. 2* (2008) 163 Cal.App.4th 1157, 1180 [78 Cal.Rptr.3d 572], italics omitted.) ■ "Finally, '[a]ll presumptions and intendments favor the validity of a statute . . . .' [Citation.]" (*Ortiz v. Lyon Management Group, Inc.* (2007) 157 Cal.App.4th 604, 613 [69 Cal.Rptr.3d 66].)

■ Subdivision (a) of section 1516.5 provides that if, as in the present case, a guardianship is in place, a proceeding to terminate parental rights may

be brought if three requirements are met: "[o]ne or both parents do not have the legal custody of the child," the "child has been *in the physical custody of the guardian* for a period of not less than two years," and the child will "benefit from being adopted by his or her guardian." (Italics added.) While the "physical custody" requirement is not more specifically defined or elucidated in section 1516.5, the statute does not for that reason fail to meet substantive due process standards. The concept of "physical custody" is not one that is incapable of being understood by persons of common intelligence or that eludes meaningful judicial review. To the contrary, by referencing common meaning and preexisting law, the term "physical custody" is readily understood. When the words used in a statute are not precisely defined, " ' "the requisite standards of certainty can be fleshed out from otherwise vague statutory language by reference to any of the following sources: (1) long established or commonly accepted usage; (2) usage at common law; (3) judicial interpretations of the statutory language or of similar language; [and] (4) legislative history or purpose." ' [Citation.] Additionally, we presume that '[t]he enacting body is deemed to be aware of existing laws and judicial constructions in effect at the time legislation is enacted.' [Citation.] In particular, when the Legislature uses a word that has been construed judicially, we can presume the word was intended in the sense placed on it by the courts." (*Zilog, Inc. v. Superior Court* (2001) 86 Cal.App.4th 1309, 1318 [104 Cal.Rptr.2d 173].)

█ We need neither resort to an examination of the legislative history of Probate Code section 1516.5 nor reform the statute to determine that the term "physical custody" is not vague.[9] While Jamie suggests that physical custody may have a range of meanings from "any," to "significant," or even "primary" custody, those terms have no established legal meaning. (See *In re Marriage of Richardson* (2002) 102 Cal.App.4th 941, 945, fn. 2 [126 Cal.Rptr.2d 45]; *In re Marriage of Lasich* (2002) 99 Cal.App.4th 702, 714 [121 Cal.Rptr.2d 356]; *In re Marriage of Biallas* (1998) 65 Cal.App.4th 755, 759–760 [76 Cal.Rptr.2d 717]; *Brody v. Kroll* (1996) 45 Cal.App.4th 1732, 1736–1737 [53 Cal.Rptr.2d 280].) The law—which was in effect when Probate Code section 1516.5 was enacted—identifies two distinct forms of physical custody, both of which are clearly defined: sole or joint physical custody. (*In re Marriage of Richardson, supra*, at p. 945, fn. 2.) " 'Sole physical custody' means that the child resides with and is supervised by one parent, subject to

---

[9] We observe that the California Supreme Court has already removed a potentially ambiguous element from section 1516.5 by adopting a construction of the statute that requires both "physical and legal custody by the guardian for two years" before a termination proceeding may be filed. (*Guardianship of Ann S.* (2009) 45 Cal.4th 1110, 1131, fn. 13 [90 Cal.Rptr.3d 701, 202 P.3d 1089] (*Ann S.*).)

court-ordered visitation by the other. (Fam. Code, § 3007.)" (*Ruisi v. Thieriot* (1997) 53 Cal.App.4th 1197, 1205, fn. 5 [62 Cal.Rptr.2d 766].) According to Family Code section 3004, " 'Joint physical custody' means that each of the parents shall have significant periods of physical custody. Joint physical custody shall be shared by the parents in such a way so as to assure a child of frequent and continuing contact with both parents, subject to Sections 3011 and 3020." (See also *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 378, fn. 3 [50 Cal.Rptr.3d 398].) ■ A court may be required to look at the existing de facto arrangement between the parties to decide whether physical custody is joint or one parent has sole physical custody with visitation rights accorded the other parent, but those, and only those, forms of well-delineated physical custody are recognized. (*People v. Mehaisin* (2002) 101 Cal.App.4th 958, 963–964 [124 Cal.Rptr.2d 683]; *In re Marriage of Biallas, supra,* at pp. 759–760.)

■ A statute is not vague if it may be made reasonably certain by reference to other definable sources. (*State Bd. of Equalization v. Wirick* (2001) 93 Cal.App.4th 411, 420 [112 Cal.Rptr.2d 919].) ■ We conclude that the term "physical custody" in section 1516.5 grants adequate notice of its meaning and is rendered reasonably certain by reference to other statutory provisions and judicial decisions that define joint and sole physical custody. We further conclude that as so defined, petitioners proved the physical custody element of section 1516.5 by clear and convincing evidence that they had either joint or sole custody of the minors at all times during the past four years of the guardianship. The statute is not void for vagueness.

III. *The Minors' Right to Counsel.*

Raymond argues that the failure of the trial court to appoint counsel for the children until the commencement of trial was error. The record shows that after the guardianship was initiated Attorney Leigh Johnson was appointed counsel for the children in June of 2005. Johnson thereafter continued to represent the minors intermittently during the guardianship proceedings. She sought increased visitation by Jamie in 2006, and on behalf of the minors recommended termination of the guardianship in February of 2007. After the petition to terminate parental rights was filed, on March 4, 2008, Jamie requested appointment of counsel for the minors. At a hearing six days later, the court appointed counsel for Jamie and Raymond, but withheld appointment of counsel for the minors. Trial on the petition was continued while the parties engaged in mediation and discussed settlement, but when the case was called for trial on June 16, 2008, Johnson appeared for the minors. She

offered an opening statement at the commencement of trial and thereafter represented the minors throughout the proceedings. Raymond argues that according to the statutory scheme the trial court was required to "consider" appointment of counsel for the minors, and under the facts of the case "the failure to appoint independent counsel for the children until the very morning of a contested trial on whether the court should terminate parental rights, was error, and prejudicial."

Petitioners maintain that Raymond lacks standing to complain of the failure of the trial court to appoint counsel to represent the minors. They rely on the general principle that while an aggrieved party in an action may file a notice of appeal, "the ability to appeal does not confer standing to assert issues when he is not aggrieved by the order from which the appeal is taken. [Citations.] [¶] Standing to challenge an adverse ruling is not established merely because a parent takes a position on an issue that affects the minor [citation]; nor can a parent raise the minor's best interest as a basis for standing [citation]. Without a showing that a parent's personal rights are affected by a ruling, the parent does not establish standing. [Citation.] To be aggrieved or affected, a parent must have a legally cognizable interest that is affected injuriously by the juvenile court's decision. [Citation.] In sum, a would-be appellant 'lacks standing to raise issues affecting another person's interests.' [Citation.]" (*In re D.S.* (2007) 156 Cal.App.4th 671, 673–674 [67 Cal.Rptr.3d 450], fn. omitted.) "Issues which do not affect the parent's own rights may not be raised in the parent's appeal." (*In re Holly B.* (2009) 172 Cal.App.4th 1261, 1265 [92 Cal.Rptr.3d 80].)

Raymond submits that the standing of a parent on appeal to raise the issue of failure to appoint counsel for the children in a proceeding to terminate parental rights "is well settled," but the cases he cites do not in the least stand for that proposition. (See *In re Laura F.* (1983) 33 Cal.3d 826, 840 [191 Cal.Rptr. 464, 662 P.2d 922]; *In re Richard E.* (1978) 21 Cal.3d 349, 354–355 [146 Cal.Rptr. 604, 579 P.2d 495]; *Adoption of Jacob C.* (1994) 25 Cal.App.4th 617, 625–626 [30 Cal.Rptr.2d 591].) In those cases, the right of the minors to representation by counsel in termination proceedings was raised by other parties, but the issue of standing was neither presented on appeal nor mentioned in the opinions. Cases are not authority for propositions not considered in the opinions. (*People v. Barragan* (2004) 32 Cal.4th 236, 243 [9 Cal.Rptr.3d 76, 83 P.3d 480]; *People v. Accredited Surety & Casualty Co., Inc.* (2004) 125 Cal.App.4th 1, 7–8 [22 Cal.Rptr.3d 375].)

However, other authority exists that directly supports Raymond's assertion of standing. Cases have uniformly held that in a proceeding to terminate parental rights "[a] father has standing to assert his child's right to independent counsel, because independent representation of the children's

interests impacts upon the father's interest in the parent-child relationship." (*In re Elizabeth M.* (1991) 232 Cal.App.3d 553, 565 [283 Cal.Rptr. 483]; see also *In re Devin M.* (1997) 58 Cal.App.4th 1538, 1541–1542 [68 Cal.Rptr.2d 666]; *In re Patricia E.* (1985) 174 Cal.App.3d 1, 6 [219 Cal.Rptr. 783]; *In re David C.* (1984) 152 Cal.App.3d 1189, 1206 [200 Cal.Rptr. 115].) We proceed to the merits of the issue of the minors' right to counsel.

Section 1516.5 does not explicitly provide for appointment of counsel for the minors in an action to terminate parental rights, but specifies in subdivision (c) that, *"The rights of the parent,* including the rights to notice and counsel provided in Part 4 (commencing with Section 7800) of Division 12 of the Family Code, shall apply to actions brought pursuant to this section." (Italics added.) Family Code section 7861, in turn, provides that in actions to terminate parental rights: "The court *shall consider whether the interests of the child require the appointment of counsel.* If the court finds that the interests of the child require representation by counsel, the court shall appoint counsel to represent the child, whether or not the child is able to afford counsel. The child shall not be present in court unless the child so requests or the court so orders." (Italics added.)

Although Family Code section 7861 does not require appointment of counsel for a minor, it demands that the court at least "consider" whether the minor should be represented by counsel, then " 'exercise its discretion' to appoint counsel for a minor in termination proceedings absent an immediate showing that counsel is not required to protect the child's interests." (*Adoption of Jacob C., supra,* 25 Cal.App.4th 617, 625, italics omitted.) " '[W]hen the court finds a child has separate interests not protected in the contest between parents and a petitioner, the court must exercise its discretion by appointing separate counsel.' [Citation.]" (*In re Laura F., supra,* 33 Cal.3d 826, 840.) "However, error in failing to appoint counsel is not reversible in the absence of a showing of prejudice." (*Adoption of Jacob C., supra,* at p. 625.) "Accordingly, failure to appoint counsel for a minor in a freedom from parental custody and control proceeding does not require reversal of the judgment in the absence of miscarriage of justice." (*In re Richard E., supra,* 21 Cal.3d 349, 355.)

Even if we assume, without deciding, that the "rights of the parent" to counsel in a section 1516.5 action also extend to counsel for the minor, we find that no error occurred in the present case. As we read the record, the trial court did consider whether the minors needed representation by independent counsel. Before trial commenced counsel was appointed for the minors for the entirety of the remaining proceedings. Their attorney, Leigh Johnson, had represented them throughout the guardianship, so she was intimately familiar with all aspects of the case and its history. A review of the proceedings

supports this conclusion. She acted vigorously in the case to represent the children. Nothing in the record indicates to us that the failure of the court to appoint Johnson as attorney for the children at an earlier stage of the proceedings was either necessary or adversely impacted their rights at trial. No prejudicial deprivation of the minors' right to counsel occurred.

## IV. *The Investigator's Report.*

Jamie and Raymond join in contending that the trial court failed to comply with the requirements of Probate Code section 1516.5, subdivision (b), which provides: "The court shall appoint a court investigator or other qualified professional to investigate all factors enumerated in subdivision (a). The findings of the investigator or professional regarding those issues shall be included in the written report required pursuant to Section 7851 of the Family Code." Family Code section 7851 specifies in subdivision (a) that the investigator "shall render to the court a written report of the investigation with a recommendation of the proper disposition to be made in the proceeding in the best interest of the child," and mandates in subdivision (b) that the report "include all of the following: [¶] (1) A statement that the person making the report explained to the child the nature of the proceeding to end parental custody and control. [¶] (2) A statement of the child's feelings and thoughts concerning the pending proceeding. [¶] (3) A statement of the child's attitude towards the child's parent or parents and particularly whether or not the child would prefer living with his or her parent or parents. [¶] (4) A statement that the child was informed of the child's right to attend the hearing on the petition and the child's feelings concerning attending the hearing." Subdivision (d) adds that, "The court shall receive the report in evidence and shall read and consider its contents in rendering the court's judgment."

The parents complain that the investigator's evaluation and report were flawed for two reasons: first and foremost, the failure of the investigator to interview either of them; and second, for that reason the investigator deferred any formal recommendation on the petition until the hearing and a therapeutic evaluation of the minors were completed to determine "the detriment to the children from termination of Jamie's parental rights, and the appropriateness of future visitation." They submit that an "independent investigation by a court investigator is an essential requirement of a private termination of parental rights" to provide the court with "the information for it to be able to make a reasoned and informed decision." They claim that the deficient investigation and report therefore require reversal per se.

As a procedural matter we point out that the parents have forfeited their right to complain of inadequacies in the report by failing to object at trial. (*In re Aaron B.* (1996) 46 Cal.App.4th 843, 846 [54 Cal.Rptr.2d 27].)

Nevertheless, we will review the sufficiency of the investigation and report to respond to the claim of incompetence of counsel made by Jamie. (*People v. Marshall* (1996) 13 Cal.4th 799, 831–832 [55 Cal.Rptr.2d 347, 919 P.2d 1280]; *People v. Ashmus* (1991) 54 Cal.3d 932, 975–976 [2 Cal.Rptr.2d 112, 820 P.2d 214]; *People v. Yarbrough* (2008) 169 Cal.App.4th 303, 310 [86 Cal.Rptr.3d 674].)

 While the report was submitted to the court and considered as demanded by section 1516.5, subdivision (b), we agree with the parents that the investigation and report were incomplete due to the inability of the investigator to locate and interview the parents before trial and the resulting lack of any definitive recommendation for disposition of the matter. The fact that the investigator made reasonable efforts to contact and meet with the father and mother does not constitute compliance with Family Code section 7851, subdivision (a), which mandates "*a recommendation of the proper disposition* to be made in the proceeding in the best interest of the child." (Italics added.) The "statutory purpose of the report is to inform the court of the best interests of the child, and the interests of the children are fundamental to the proceeding," so it is "the trial court's obligation to read and consider the report sua sponte." (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 169 [16 Cal.Rptr.3d 754].) Family Code section 7851 does not explicitly require the investigation and report to include an interview with the parents— the statute focuses instead on obtaining the "child's feelings and thoughts" on the proceeding as a means of evaluating the child's best interests—but the failure of the report to provide a recommendation of the proper disposition constitutes procedural noncompliance with the statute.

 We disagree with the parents' contention that the error is reversible per se. Per se reversal is required only in rare cases where the structural integrity of a trial is compromised. (*People v. Flood* (1998) 18 Cal.4th 470, 501–502 [76 Cal.Rptr.2d 180, 957 P.2d 869]; *People v. Bell* (1996) 45 Cal.App.4th 1030, 1066 [53 Cal.Rptr.2d 156].) Errors such as the one at issue here, which may be quantitatively assessed in the context of the evidence to determine prejudice, are not structural defects. (See *In re James F.* (2008) 42 Cal.4th 901, 917 [70 Cal.Rptr.3d 358, 174 P.3d 180].) To the contrary, the fundamental rule in California is that judgments cannot be set aside "unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; see also *People v. Steele* (2000) 83 Cal.App.4th 212, 224 [99 Cal.Rptr.2d 458].) Nor did the court act in excess of its jurisdiction in the present case, as Jamie suggests. The court is not stripped of jurisdiction if an *incomplete* report is filed. (See *In re Melinda J.* (1991) 234 Cal.App.3d 1413, 1419 [286 Cal.Rptr. 239].) This is not a case in which the parties' due process rights were violated because they did not receive the report or no investigation was conducted. (Cf. *In re*

*Linda W.* (1989) 209 Cal.App.3d 222, 226–227 [257 Cal.Rptr. 52]; *In re George G.* (1977) 68 Cal.App.3d 146, 156–157 [137 Cal.Rptr. 201].) The report *was* filed and submitted in accordance with statutory requirements; the only flaw was the lack of a conclusive dispositional recommendation due to the inability of the investigator to contact the parents. " 'Deficiencies in an assessment report surely go to the weight of the evidence, and if sufficiently egregious may impair the basis of a court's decision to terminate parental rights,' " but are not prejudicial per se. (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 14 [75 Cal.Rptr.3d 86].)

We view the error as one of procedural statutory dimension only; it did not affect the parties' due process rights. The parents received the report and were given the opportunity to cross-examine the investigator about the failure to interview Jamie. Thus, the parents must affirmatively demonstrate prejudice to prevail on appeal. (*In re M.F.* (2008) 161 Cal.App.4th 673, 680 [74 Cal.Rptr.3d 383]; *In re Melinda J., supra*, 234 Cal.App.3d 1413, 1419.) Reversal is appropriate "only if we conclude '. . . it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.' [Citations.]" (*In re Marriage of Jones* (1998) 60 Cal.App.4th 685, 694 [70 Cal.Rptr.2d 542]; see also *Neumann v. Melgar, supra*, 121 Cal.App.4th 152, 170.)

Upon review of the record, we find that the error was harmless beyond any reasonable doubt. The purpose of the investigation and report required by the statute is to provide the court with a full understanding of the factual setting of the petition for termination of parental rights. Not only did Parson testify about the contents of her report and the reasons for the lack of a recommendation, but the information that was omitted from the report—that is, the results of interviews with the parents—was thoroughly presented and considered at trial. Jamie testified at trial, and evidence of interviews with her was presented in the form of testimony, reports and letters from Emerson and Dr. Bongiovanni. Parson also offered testimony that articulated her recommendation for resolution of the action. We find the court possessed complete and accurate information concerning the minors, the parents, the guardians, and the professional recommendations of the appointed experts in the case. Any noncompliance with section 1516.5, subdivision (b), did not result in a miscarriage of justice or any prejudicial inadequate assistance of counsel. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 503 [102 Cal.Rptr.2d 196].)

V. *The Evidence in Support of the Decision to Terminate Parental Rights.*

We proceed to the argument that the evidence does not support the trial court's decision to terminate parental rights. Raymond's brief engages in a lengthy discourse to present the claim that the evidence fails to prove the

essential element pursuant to section 1516.5 "that the benefit to Emma and Noreen of being adopted by their guardians outweighs the detriment they would suffer from termination of parental rights." He proposes that the standard for termination of parental rights under section 1516.5 is not merely "some benefit to the child from adoption," but rather whether, "considering all factors relevant to the child's best interests, including any detriment the child would suffer, it would be in the child's best interests to terminate parental rights." From this premise he argues that "it is not possible to conclude that substantial evidence supports the trial court's decision," particularly in light of the investigator's failure to complete the investigation and provide the court with a recommendation.

The parents also contend that the trial court exceeded the bounds of appropriate judicial discretion by taking into consideration the order for continuing visitation as a factor that ameliorates the detriment to the children from the termination of parental rights. They point out that a posttermination visitation order is unenforceable, and the court must presume that termination of parental rights will result in cessation of all contact between parent and child. (See *In re S.B.* (2008) 164 Cal.App.4th 289, 300 [79 Cal.Rptr.3d 449].) They claim that the court thus did not apply proper criteria or reasoning to reach the decision to terminate parental rights.

Our review of the evidence is constrained. "Although a trial court must make such findings based on clear and convincing evidence ([Fam. Code,] § 7821), this standard of proof ' "is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard." ' [Citation.] Under the substantial evidence standard of review, ' "[a]ll conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment." ' [Citation.]" (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1010–1011 [79 Cal.Rptr.3d 743], fn. omitted; see also *In re Amy A.* (2005) 132 Cal.App.4th 63, 67 [33 Cal.Rptr.3d 298].) "It was the trial court's duty to determine whether" the petitioners met their "burden of proof; it is our duty to determine whether there is substantial evidence to support the trial court's findings that it did." (*In re Robert J.* (1982) 129 Cal.App.3d 894, 901 [181 Cal.Rptr. 188].)

Also, the decision to terminate parental rights lies in the first instance within the discretion of the trial court, "and will not be disturbed on appeal absent an abuse of that discretion. [Citation.] While the abuse of discretion standard gives the court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." ' [Citation.] 'Action that

transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion.' [Citation.]" (*In re Baby Girl M.* (2006) 135 Cal.App.4th 1528, 1536 [38 Cal.Rptr.3d 484].)

 The prerequisites to termination of parental rights under section 1516.5 are straightforward. "Section 1516.5 authorizes the termination of parental rights after two years of probate guardianship, if adoption by the guardian is in the child's best interest." (*Ann S., supra,* 45 Cal.4th 1110, 1124.) The statute specifies in unambiguous terms that the court must find "that the child would benefit from being adopted by his or her guardian." (§ 1516.5, subd. (a)(3).) Evidence of parental unfitness or that terminating parental rights is the least detrimental alternative for the child is not required in a section 1516.5 proceeding. (*Ann S., supra,* at p. 1128.) "[T]he parental fitness standard, which protects parents' interests in child custody, is not necessarily required at a section 1516.5 hearing. By that stage, the parent-child family unit has ceased to exist and the parent's entitlement to custody is not at issue. It would be anomalous to require proof in every case, by clear and convincing evidence, that a mother or father who has had no custodial responsibilities for two or more years is currently an unfit parent." (*Id.* at p. 1135.) Nothing more must be proved than that termination of parental rights and adoption by the guardian are "in the 'best interests of the child.' " (*Id.* at p. 1129.) And in determining the best interests of the child, the trial court must consider all factors, "which would include the circumstances leading to guardianship, the parent's efforts to maintain contact with the child, any exigencies that might hamper those efforts, and other evidence of commitment to parental responsibilities. (§ 1516.5, subd. (a)(3).)" (*Id.* at p. 1132.) Under section 1516.5, the detriment of terminating parental rights is not balanced directly against the benefits of adoption; it is only a factor to be considered when evaluating the child's best interest.

We have no difficulty in finding that the evidence supports the trial court's decision that termination of parental rights and adoption by petitioners is in the best interests of the minors. During the guardianship of nearly four years, Jamie failed to successfully remedy the problems, particularly of domestic abuse, that necessitated the guardianship in the first place. The guardianship was created due to Jamie's inability to provide a stable home for the children free from substance abuse, severe emotional discord, and violence. For the most part, that conduct and environment persisted throughout the course of the guardianship. Even after the petition was filed, Jamie continued to exhibit unstable behavior by harassing the guardians. The children also acquired a deep attachment to the guardians and a secure home with them. Evidence was presented that the children were well adjusted and happy in the guardians' home, but displayed increased symptoms of anxiety and depression when they visited Jamie. The California Supreme Court has recognized: "After

years of guardianship, the child has a fully developed interest in a stable, continuing, and permanent placement with a fully committed caregiver. [Citations.] The guardian, after fulfilling a parental role for an extended period, has also developed substantial interests that the law recognizes." (*Ann S., supra*, 45 Cal.4th 1110, 1136, fn. omitted.)

The evidence adduced from the various experts also uniformly established that the minors were at substantial risk in the mother's home of social, emotional and behavioral detriment. The experts definitively asserted that the minors would benefit from the stability that would accompany permanent placement with the guardians and cessation of their continued transitional existence. We do not agree with the parents' assertion that their parental rights were improperly terminated to prevent Jamie from continuing to seek termination of the guardianship. The court instead found that continuation of the guardianship due to the ongoing failure of Jamie to improve and control her behavior was detrimental to the children. Although we acknowledge, as did the experts and Juliana, that the minors demonstrated a loving bond with their mother, we discern substantial evidence in the record in support of the finding of benefit to the minors. (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 551–552 [243 Cal.Rptr. 763].)

Finally, the finding that termination and adoption by the guardians is in the minors' best interest is not flawed by any mistaken consideration by the trial court of the mitigating influence of the order for continuing visitation. First, our focus is upon the ultimate decision rather than the underlying analysis of the trial court. " 'Our task is to determine whether the judgment should be affirmed or reversed. Thus, we review the judgment for reversible error, not merely to determine whether the trial court's interpretation . . . was correct, but whether the judgment is correct on any theory. [Citation.] "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." [Citation.]' [Citation.] 'We review the trial court's ruling, not its reasoning.' [Citations.]" (*As You Sow v. Conbraco Industries* (2005) 135 Cal.App.4th 431, 447–448 [37 Cal.Rptr.3d 399].)

Further, we do not discern any indication in the record that the court based its assessment of the minors' best interests on the expectation of continued visitation by the parents. As we view the evidence and the trial court's statement of decision, the visitation and termination orders were neither dependent upon each other nor even considered in conjunction with each other. The court also did not in any fashion find that detriment from

termination of parental rights would be mitigated by continued visitation. Instead, the court made entirely separate findings on termination and visitation, with the latter being based on the perceived consent of the parties, not any determination that detriment to the children would be moderated by visitation.

 The advantage of a stable, permanent adoptive home for the minors outweighs the benefit of a continued relationship with Jamie, who despite her efforts and somewhat positive visitation record failed to successfully overcome the disruptive, offending behavior that led to the guardianship. (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351–1352 [93 Cal.Rptr.2d 644].) The trial court did not err by terminating the parental rights of Raymond and Jamie.

## VI. *The Indian Child Welfare Act.*

The parents' final contention, presented by Jamie and joined in by Raymond, is that the judgment must be reversed due to the failure of the trial court to comply with the requirements of the ICWA. (25 U.S.C. § 1901 et seq.) Jamie points out that subdivision (d) of Probate Code section 1516.5 explicitly provides: "This section does not apply to any child who is a dependent of the juvenile court or to any Indian child." The parents therefore argue that the failure of the court, the court investigator or petitioners "to comply with the notice and inquiry requirements of California's implementation of the [ICWA] compels conditional reversal" of the judgment and a remand for the trial court to satisfy the necessary inquiry and notice provisions of the ICWA.

We begin our examination of this issue by observing that no claim was made in the trial court that the minors have Indian ancestry, and no evidence is found in the record that they may be Indian children. Hence, at least on the record before us, the termination of parental rights is not precluded by subdivision (d) of section 1516.5. The remaining issue is whether the court, the petitioners, or the court investigator had a duty in the trial court proceedings to inquire into Indian ancestry of the minors without either any challenge on that ground or hint in the evidence of its existence.

 "Admittedly, it has been held—including by this court—that a parent does not necessarily waive an ICWA notice issue by failing to raise it below." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1159 [30 Cal.Rptr.3d 726]; see also *In re J.T.* (2007) 154 Cal.App.4th 986, 991 [65 Cal.Rptr.3d 320].) These cases "reason that ' "[t]he notice requirements serve the interests of the Indian tribes 'irrespective of the position of the parents' and cannot be waived by the parent. [Citation.]" [Citation.]' [Citation.]" (*In re S.B., supra,* at p. 1159.) We advance to the issue of compliance with the ICWA.

■ First, the ICWA itself does not require an *inquiry*, where, as here, no evidence of an Indian child has been presented. The fundamental procedural safeguard in the ICWA "is a provision for notice, which states in part: 'In any involuntary proceeding in a State court, where *the court knows or has reason to know that an Indian child is involved*, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention.' (25 U.S.C. § 1912(a)." (*In re D. T.* (2003) 113 Cal.App.4th 1449, 1454 [5 Cal.Rptr.3d 893], italics added; see also *In re Mary G.* (2007) 151 Cal.App.4th 184, 209 [59 Cal.Rptr.3d 703].) "In *In re H.B.* (2008) 161 Cal.App.4th 115, 120 [74 Cal.Rptr.3d 27], the court explained that neither the ICWA nor controlling federal regulations '*expressly* impose any duty to inquire as to American Indian ancestry.' [Citation.]" (*In re A.B.* (2008) 164 Cal.App.4th 832, 838 [79 Cal.Rptr.3d 580].)

■ "However, the 'ICWA provides that states may provide "a higher standard of protection to the rights of the parent . . . of an Indian child than the rights provided under [ICWA]" [citation], and long-standing federal guidelines provide "the state court shall make inquiries to determine if the child involved is a member of an Indian tribe [or] if a parent of the child is a member of an Indian tribe and the child is eligible for membership in an Indian tribe." ' [Citations.]" (*In re A.B., supra,* 164 Cal.App.4th 832, 838–839.) The California Legislature has "adopted statutes and rules of court to implement the ICWA. (See [Cal. Rules of Court,] rule 5.480.)" (*Id.* at p. 838.) "Section 224, subdivision (d) [of the Welfare and Institutions Code also] expressly provides if a state or federal law provides a higher standard than more lenient ICWA requirements, the higher standard shall prevail." (*In re Damian C.* (2009) 178 Cal.App.4th 192, 197 [100 Cal.Rptr.3d 110].)

The California law found in Welfare and Institutions Code "[s]ection 224.3, subdivision (a) provides: 'The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether a [*dependent*] *child* . . . is or may be an Indian child in all *dependency proceedings* . . . .' [Citation.]" (*In re A.B., supra,* 164 Cal.App.4th 832, 838, italics added.)[10] While the action before us is not a dependency proceeding as referred to in Welfare and Institutions Code section 224.3, the California Rules of Court mandate a duty of inquiry which extends beyond

---

[10] Subdivision (a) of Welfare and Institutions Code section 224.3 reads: "The court, county welfare department, and the probation department have an affirmative and continuing duty to inquire whether *a child for whom a petition under Section 300, 601, or 602 is to be, or has been, filed is or may be an Indian child in all dependency proceedings and in any juvenile wardship proceedings* if the child is at risk of entering foster care or is in foster care." (Italics added.)

dependency proceedings to other related actions.[11] Rule 5.481(a) specifies: "The court, court-connected investigator, and party seeking a foster-care placement, guardianship, conservatorship, custody placement under Family Code section 3041, declaration freeing a child from the custody or control of one or both parents, *termination of parental rights, or adoption* have an affirmative and continuing duty to inquire whether a child is or may be an Indian child in all proceedings identified in rule 5.480." (Italics added.) Rule 5.481(a)(1) adds: "The party seeking a foster-care placement, guardianship, conservatorship, custody placement under Family Code section 3041, *declaration freeing a child from the custody or control of one or both parents, termination of parental rights, or adoption* must ask the child, if the child is old enough, and the parents, Indian custodian, or legal guardians whether the child is or may be an Indian child and must complete the *Indian Child Inquiry Attachment* (form ICWA-010(A)) and attach it to the petition unless the party is filing a subsequent petition, and there is no new information." (First italics added.) Further, rule 5.480 states in pertinent part: "This chapter addressing the Indian Child Welfare Act (25 United States Code section 1901 et seq.) as codified in various sections of the California Family, Probate, and Welfare and Institutions Codes, *applies to all proceedings involving Indian children that may result in* an involuntary foster care placement; *guardianship or conservatorship placement*; custody placement under Family Code section 3041; *declaration freeing a child from the custody and control of one or both parents; termination of parental rights; or adoptive placement* . . . ."[12] (Italics added.)

 Under the broad language of rule 5.481, the duty of inquiry attaches to *any* proceeding which may result in termination of parental rights or adoptive placement. Thus, during the course of the guardianship proceeding no duty of inquiry was created, but when the petition to terminate parental rights was filed the court, court-connected investigator, and petitioners were vested with the affirmative and continuing duty pursuant to rule 5.481(a) to inquire whether the minors are or may be Indian children. Nothing in the court investigator's report or the remainder of the evidence indicates that the requisite rule 5.481(a) inquiry was undertaken or even considered. (*In re N.E.* (2008) 160 Cal.App.4th 766, 769–770 [73 Cal.Rptr.3d 123].)

The breach of duty to inquire into the Indian heritage of the minors was error that necessitates "a limited reversal of an order or judgment and remand for proper inquiry and any required notice [that] may be necessary. [Citation.] Reversal is not warranted, however, when the court's noncompliance with the

---

[11] All further references to rules are to the California Rules of Court.

[12] The provisions addressing the ICWA explicitly do "not apply to voluntary foster care and guardianship placements where the child can be returned to the parent or Indian custodian on demand." (Rule 5.480.)

inquiry requirement constitutes harmless error." (*In re A.B., supra*, 164 Cal.App.4th 832, 839.) Where the record below fails to demonstrate and the parents have made no offer of proof or other affirmative assertion of Indian heritage on appeal, a miscarriage of justice has not been established and reversal is not required. (See *In re N.E., supra*, 160 Cal.App.4th 766, 769–771; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430–1431 [49 Cal.Rptr.3d 951].) Here, although evidence of Indian heritage is entirely lacking in the record before us, Jamie has made a claim on appeal that an ancestor—her father's grandmother named Ella Morgan—is listed on the "Dawes Rolls" as a Seminole Indian. She has also requested that we take additional documentary evidence on appeal that she asserts supports her claim of the minors' Indian ancestry. Petitioners have also asked that we take additional evidence in rebuttal, in the form of Ronald's declaration and attachments that purport to show the person identified by his sister Jamie as her ancestor Ella Morgan is not a Seminole Indian, and is a male rather than a female. Petitioners argue that if we consider the mother's additional evidence we should also consider the proffered additional evidence in opposition to her claim of Indian heritage.

▮ We decline to take any additional evidence in this matter. Code of Civil Procedure section 909 governs the taking of additional evidence on appeal; it provides in pertinent part: "The reviewing court may for the purpose of making the factual determinations or for any other purpose in the interests of justice, take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and may give or direct the entry of any judgment or order and may make any further or other order as the case may require. This section shall be liberally construed to the end among others that, where feasible, causes may be finally disposed of by a single appeal and without further proceedings in the trial court except where in the interests of justice a new trial is required on some or all of the issues." "Code of Civil Procedure section 909 allows appellate courts to 'accept evidence in dependency cases "to expedite just and final resolution for the benefit of the children involved." ' [Citation.]" (*In re A.B., supra*, 164 Cal.App.4th 832, 843.)

In practice, Code of Civil Procedure section 909 has quite limited application. " ' "Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule [8.252] of the California Rules of Court, the authority should be exercised sparingly. [Citation.] *Absent exceptional circumstances, no such findings should be made.* [Citation.]" [Citations.]' [Citation.]" (*In re Valerie W., supra*, 162 Cal.App.4th 1, 9.) The statute does "not affect the respective provinces of the trial and reviewing courts, nor change the established rule against appellate weighing of evidence. The power to invoke the statute should be exercised sparingly, ordinarily only in order to affirm the lower court decision and

terminate the litigation, and in very rare cases where the record or new evidence compels a reversal with directions to enter judgment for the appellant [citation]. The procedure under Code of Civil Procedure section 909 is not a substitute for a motion for a new trial on the basis of newly discovered evidence. [Citations.] The reviewing courts are not equipped to undertake an appreciable amount of evidence taking on appeal." (*Monsan Homes, Inc. v. Pogrebneak* (1989) 210 Cal.App.3d 826, 830 [258 Cal.Rptr. 676].) "The evidence-taking and fact-finding powers of the appellate courts do not convert them into triers of fact or abrogate the general rule that findings of the trial court based on substantial evidence are conclusive on appeal. [Citation.] The purpose of the statute and the rule implementing it 'is to enable appellate courts, in appropriate cases, to terminate litigation by affirmance, or modification and affirmance, of the judgment, or by reversal with directions to enter judgment for appellant if it appears that on no reasonable theory could respondent make a further showing in the trial court. [Citations.]' [Citation.] They do not warrant an appellate court's general reversal of a judgment on the basis of newly discovered evidence presented in the appellate court." (*People v. Pena* (1972) 25 Cal.App.3d 414, 421–422 [101 Cal.Rptr. 804].)

The parties before us are seeking to have us consider new, conflicting evidence to decide an issue that was not litigated in the trial court. Mother's motion would seek to effectuate a *reversal* of the judgment based on newly discovered evidence and a newly presented issue on appeal. Petitioners' motion seeks to present directly contradictory evidence on the same issue. This case does not offer any "exceptional circumstances" that warrant the taking of additional evidence from either party. (*In re Valerie W., supra*, 162 Cal.App.4th 1, 9.)

We therefore deny the motions to take additional evidence to decide the issue of compliance with the ICWA.[13] Given the offer of proof and assertions by Jamie of her Indian heritage, however, without reversal of the judgment

[13] The parties have also filed motions to augment the record and to take judicial notice of various documents. The motion of Jamie filed February 6, 2009, to augment the record or take judicial notice of proposed statements of decision is denied. The motion of the parents filed February 9, 2009, to take judicial notice of legislative documents associated with the enactment of section 1516.5 is granted, although we may consider that material without a formal motion. (See *In re Jorge M.* (2000) 23 Cal.4th 866, 886, fn. 10 [98 Cal.Rptr.2d 466, 4 P.3d 297]; *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 45, fn. 9 [77 Cal.Rptr.2d 709, 960 P.2d 513]; *People v. Eubanks* (1996) 14 Cal.4th 580, 591, fn. 3 [59 Cal.Rptr.2d 200, 927 P.2d 310]; *People v. Cruz* (1996) 13 Cal.4th 764, 773–774, fn. 5 [55 Cal.Rptr.2d 117, 919 P.2d 731].) The motion of Juliana filed May 13, 2009, to take judicial notice of court documents is granted, with the exception of exhibit 38, the article in the Contra Costa Times newspaper. The existence of the newspaper article is irrelevant, and the truth of its contents is not judicially noticeable. (*Mangini v. R. J. Reynolds Tobacco Co.* (1994) 7 Cal.4th 1057, 1063 [31 Cal.Rptr.2d 358, 875 P.2d 73].)

we must make a limited remand with directions to the trial court to effectuate proper inquiry and comply with the notice provisions of the ICWA if Indian heritage is indicated. (*In re Damian C., supra,* 178 Cal.App.4th 192, 199–200; *In re A.B., supra,* 164 Cal.App.4th 832, 839; *In re Cody B.* (2007) 153 Cal.App.4th 1004, 1014 [63 Cal.Rptr.3d 652].) If, after proper inquiry and notice, a tribe determines the minors are Indian children, the parents may petition the court to invalidate the termination of parental rights upon a showing that such action violated the provisions of the ICWA. (*In re Damian C., supra,* at pp. 199–200.)

*The Appeal of the Guardians*

I. *The Authority of the Trial Court to Order Visitation.*

The appeal of the guardians contests only the visitation orders that accompanied the termination of parental rights.[14] The court granted Jamie one supervised visit per month for up to eight hours; Raymond was granted two four-hour supervised visits per year. The guardians' challenge to the visitation orders is three pronged: First, that the court had no "authority to make visitation orders after the termination of parental rights" in the case; second, the court "did not make required findings that visitation would actually benefit the children"; and third, the evidence shows "that continuing visitation with the mother and resuming visitation with the father would in fact be detrimental to these young and vulnerable children." Their essential position is that the trial court exceeded its authority and abused its discretion by granting the mother and father supervised visitation with the children.

We first consider the trial court's authority to grant visitation upon termination of parental rights. The guardians have presented this argument in a most cursory fashion, and failed to provide any supporting citation to authority until their reply brief. We nevertheless confront the issue, as it reflects upon the fundamental authority of the court in a section 1516.5 action to award visitation to a parent who is concomitantly deprived of all parental rights.

We begin our analysis by observing that neither section 1516.5, nor any other statutory provisions that govern guardianship actions pursuant to part 4 (commencing with § 7800) of division 12 of the Family Code, either expressly provide for or proscribe visitation by the birth parents upon termination of parental rights. The statutory scheme is entirely silent on the issue of

---

[14] We find that the combined brief of the guardians has adequately distinguished the discussion of the issues presented in their separate cross-appeal from their reply to the issues presented in the parents' appeal. We also find that the termination and visitation orders are discrete and based on separate findings, such that we may separately consider and resolve them on appeal.

posttermination visitation. We therefore turn for guidance to related statutory proceedings and existing case law to determine the authority of the court in a section 1516.5 proceeding to order posttermination or postadoption visitation.

In dependency proceedings, an order terminating parental rights is not only conclusive and binding upon the birth parents, but also effectuates a complete and final legal termination of the parental relationship. (Welf. & Inst. Code, § 366.26. subd. (i); *In re Angelia P.* (1981) 28 Cal.3d 908, 915–916 [171 Cal.Rptr. 637, 623 P.2d 198]; *In re Robert J., supra,* 129 Cal.App.3d 894, 904–905.) The parent-child relationship enjoys no legal recognition after termination of parental rights. (*In re S.B., supra,* 164 Cal.App.4th 289, 300.) Thus, nothing in Welfare and Institutions Code section 366.26 requires the court to address postadoption visitation when terminating parental rights under Welfare and Institutions Code section 366.26, and the court has no authority to essentially modify a termination order by granting visitation to the parent. (See *In re Hector A.* (2005) 125 Cal.App.4th 783, 799 [23 Cal.Rptr.3d 104]; *In re Jacob E.* (2004) 121 Cal.App.4th 909, 925 [18 Cal.Rptr.3d 15]; *In re Diana G.* (1992) 10 Cal.App.4th 1468, 1482–1483 [13 Cal.Rptr.2d 645].) And, an order that terminates parental rights and selects adoption as the permanent plan—which is analogous to a termination order pursuant to Probate Code section 1516.5—frees the child from all parental rights, custody or control, and does not sanction the maintenance of reasonable visitation. (*In re Jacob E., supra,* at p. 925; *In re Steven A.* (1993) 15 Cal.App.4th 754, 765–766 [19 Cal.Rptr.2d 576]; *In re Diana G., supra,* at pp. 1482–1483; *In re Albert B.* (1989) 215 Cal.App.3d 361, 385 [263 Cal.Rptr. 694].)

Further, once a child is adopted, by whatever means, under the "general" adoption provisions of Family Code section 8617 the birth parents of an adopted child " 'are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child' " (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417, 426 [2 Cal.Rptr.3d 699, 73 P.3d 554]), unless the parties "plainly have stated their intention to waive section 8617's benefits." (*Id.* at p. 434; see also *Marckwardt v. Superior Court* (1984) 150 Cal.App.3d 471, 475 [198 Cal.Rptr. 41].) "When a child is adopted, the law creates a parent-child relationship between the adopting parent(s) and the child and severs the child's relationship with his or her natural family. (Civ. Code, §§ 228, 229.)" (*Huffman v. Grob* (1985) 172 Cal.App.3d 1153, 1155 [218 Cal.Rptr. 659].) The basic purpose of termination of parental rights and adoption is to promote the welfare, protection and betterment of the child by providing the security of a stable adoptive home when those conditions have been otherwise missing from the child's life, and to confer upon the new parents discretion to provide for the best interests of the adopted child unfettered by interference from the former relatives. (See *Sharon S. v. Superior Court, supra,* at p. 437; *In re*

*Robert J., supra,* 129 Cal.App.3d 894, 904; *Huffman v. Grob, supra,* at pp. 1157–1158.) Adoption thus "results in a complete substitution of parents, as opposed to a guardianship, for example, which only suspends the rights of parents. Adoption extinguishes the rights of natural parents forever." (*Estate of Cleveland* (1993) 17 Cal.App.4th 1700, 1707 [22 Cal.Rptr.2d 590].) Absent an explicit agreement to the contrary, a birth parent is not entitled to postadoption visitation with his or her children. (See *In re Sylvia R.* (1997) 55 Cal.App.4th 559, 563 [64 Cal.Rptr.2d 93]; *Huffman v. Grob, supra,* at p. 1158.)

■ We assume that in enacting section 1516.5 the Legislature was aware of existing law which does not provide for visitation following termination of parental rights and adoption of the child, and intended to maintain a consistent body of laws. (*Starrh & Starrh Cotton Growers v. Aera Energy LLC* (2007) 153 Cal.App.4th 583, 607 [63 Cal.Rptr.3d 165]; *Burlington Northern & Santa Fe Ry. Co. v. Public Utilities Commission* (2003) 112 Cal.App.4th 881, 889 [5 Cal.Rptr.3d 503].) If the Legislature had intended to depart from established law in section 1516.5 actions to authorize a visitation order upon termination of parental rights in the absence of an agreement, a provision to do so could have easily been expressly added to the statute. That it was not indicates to us a legislative intent to leave the law as it stands. (See *Real Estate Analytics, LLC v. Vallas* (2008) 160 Cal.App.4th 463, 480 [72 Cal.Rptr.3d 835]; *Velez v. Smith* (2006) 142 Cal.App.4th 1154, 1174 [48 Cal.Rptr.3d 642]; *Zilog, Inc. v. Superior Court, supra,* 86 Cal.App.4th 1309, 1318; *Massa v. Southern Cal. Rapid Transit Dist.* (1996) 43 Cal.App.4th 1217, 1221 [51 Cal.Rptr.2d 164].) As the evidence presented in the present case also illustrates, the policy of promoting the security and stability of the children that is furthered by adoption is best served by foreclosing continuing visitation upon cessation of a guardianship and termination of parental rights absent an agreement to the contrary.

We of course recognize an important distinction between dependency and Probate Code section 1516.5 proceedings: a Welfare and Institutions Code section 366.26 action to terminate parental rights generally but not always, "requires some showing of parental unfitness before rights are terminated, to protect the parent's fundamental interest in child custody," whereas a termination proceeding brought under Probate Code section 1516.5 after the "parent has failed to exercise any custodial responsibility" other than visitation for a two-year period, does not demand proof that "the parent is currently unfit" and instead "appropriately requires the court to balance all the familial interests in deciding what is best for the child." (*Ann S., supra,* 45 Cal.4th 1110, 1118.) A finding of parental unfitness certainly furnishes an additional basis in dependency proceedings for concluding that continued visitation is

not in the best interests of the child. We are nevertheless persuaded that the fundamental reasons for foreclosing visitation upon termination of parental rights or adoption, whether pursuant to Welfare and Institutions Code section 366.26 or Probate Code section 1516.5—that is, to serve the best interest of the child and promote the stability that attaches to the impending adoptive relationship—are best served by severing visitation rights upon termination of parental rights pursuant to Probate Code section 1516.5. We therefore conclude that, as in other proceedings for termination of parental rights as a prelude to contemplated adoption, if parental rights are terminated in an action pursuant to section 1516.5 the court does not have authority to order continuing visitation by the birth parents.

## II. *The Claim That the Guardians Stipulated or Agreed to Grant Visitation to the Parents.*

The parents argue that the guardians stipulated or agreed to a visitation order at trial, and therefore cannot object to it on appeal.[15] Their claim of stipulation or agreement to visitation is based upon Juliana's expression of concurrence to her counsel's query that if the petition was granted and Emerson advised her "it was in the best interests of the children to see their mother from time to time," she was "willing to allow" visitation by Jamie. Juliana subsequently testified that she was "fine with [Jamie] having supervised visitation, because that is what [the] court ordered and that is what we have provided." She also articulated vague concurrence with a prior offer of one hour of visitation by the children per year with Raymond if his parental rights were terminated.

We acknowledge that a stipulation by the guardians to grant visitation would bar them from advancing the issue on appeal. (See *Adoption of Arthur M.* (2007) 149 Cal.App.4th 704, 719 [57 Cal.Rptr.3d 259]; *In re Jennifer V.* (1988) 197 Cal.App.3d 1206, 1209 [243 Cal.Rptr. 441].)[16] We also discern two other means by which visitation may be granted to parents despite an order of termination of parental rights or adoption.

---

[15] The trial court recognized the lack of "power to make visitation orders for a parent whose rights have been terminated," but perceived that the parties had "stipulated that the court could make a visitation order, even if parental rights were terminated."

[16] We also appreciate that the guardians did not object to the trial court's authority to order visitation, perhaps because the court announced that an agreement for visitation had been reached. In any event, the claim that the trial court exceeded its statutory authority by ordering visitation presents a legal question that does not implicate the court's discretion, and thus may be reviewed and corrected by an appellate court without an objection below. (*People v. Welch* (1993) 5 Cal.4th 228, 235–236 [19 Cal.Rptr.2d 520, 851 P.2d 802]; *People v. Slattery* (2008) 167 Cal.App.4th 1091, 1095 [84 Cal.Rptr.3d 672].)

 First, the statutory provisions in section 8617 of the Family Code that relieve the birth parents of all rights with regard to an adopted child are for the benefit of the parties to an adoption petition, and are thus "waivable by the parties thereto, rather than a mandatory prerequisite to every valid adoption." (*Sharon S. v. Superior Court, supra*, 31 Cal.4th 417, 427.) However, " ' " 'waiver is the "intentional relinquishment or abandonment of a known right." [Citations.]' [Citation.]" [Citation.]' [Citation.]" (*In re Stier* (2007) 152 Cal.App.4th 63, 74 [61 Cal.Rptr.3d 181].) " 'The burden is on the party claiming a waiver of right to prove it by clear and convincing evidence that does not leave the matter to speculation. As a general rule, doubtful cases will be decided against the existence of a waiver. . . .' [Citation.]" (*Garamendi v. Golden Eagle Ins. Co.* (2004) 116 Cal.App.4th 694, 721 [10 Cal.Rptr.3d 724]; see also *Rinaker v. Superior Court* (1998) 62 Cal.App.4th 155, 168 [74 Cal.Rptr.2d 464].)

 Agreements that provide for birth parents to continue visitation with their children following termination of parental rights or adoption are also recognized by statute and enforceable, but any such agreements must be in writing and must be found by the court to be in the best interests of the children. (Fam. Code, § 8616.5; see also *Adoption of Hannah S.* (2006) 142 Cal.App.4th 988, 1000, fn. 1 [48 Cal.Rptr.3d 605]; *In re Zachary D.* (1999) 70 Cal.App.4th 1392, 1396 [83 Cal.Rptr.2d 407].)[17] "In order to remove barriers to adoption by relatives and to preserve family relationships, the Family Code provides for adoption by a relative of a dependent child and for a written and signed kinship adoption agreement between the relative and a birth parent, which shall be attached to and filed with a petition for adoption by the relative. (Fam. Code, §§ 8714.5, 8714.7.)[18] The agreement may include, but is limited to, visitation and future contact with the child and his or her siblings and half-siblings and the sharing of information about the child. (Fam. Code, § 8714.7, subd. (a).)" (*In re Zachary D., supra*, at pp. 1395–1396, fn. omitted.)

---

[17] Family Code section 8616.5, subdivision (a) provides in pertinent part: "The Legislature finds and declares that some adoptive children may benefit from either direct or indirect contact with birth relatives, including the birth parent or parents or an Indian tribe, after being adopted. Postadoption contact agreements are intended to ensure children of an achievable level of continuing contact when contact is beneficial to the children and the agreements are voluntarily entered into by birth relatives, including the birth parent or parents or an Indian tribe, and adoptive parents." Subdivision (b)(1) of section 8616.5 adds: "Nothing in the adoption laws of this state shall be construed to prevent the adopting parent or parents, the birth relatives, including the birth parent or parents or an Indian tribe, and the child from voluntarily entering into a *written agreement* to permit continuing contact between the birth relatives, including the birth parent or parents . . . ." (Italics added.)

Rule 5.400(a) also provides for postadoption visitation agreements in "any adoption of a child."

[18] Since *In re Zachary, supra*, 70 Cal.App.4th 1392, the Legislature has renumbered section 8714.7 to section 8616.5. Section 8714.5 remains the same numbered section.

██ We do not construe comments made during Juliana's testimony as a stipulation or an expression of a waiver indicating that the court had discretion to order visitation under any particular terms, or visitation in any form. "[I]n determining whether the parties entered into a binding settlement of all or part of a case, a trial court should consider whether (1) the material terms of the settlement were explicitly defined, (2) the supervising judicial officer questioned the parties regarding their understanding of those terms, and (3) the parties expressly acknowledged their understanding of and agreement to be bound by those terms. In making the foregoing determination, the trial court may consider declarations of the parties and their counsel, any transcript of the stipulation orally presented and recorded by a certified reporter, and any additional oral testimony." (*In re Marriage of Assemi* (1994) 7 Cal.4th 896, 911 [30 Cal.Rptr.2d 265, 872 P.2d 1190].) ██ Parties must "plainly" state "their intention to waive section 8617's benefits." (*Sharon S. v. Superior Court, supra*, 31 Cal.4th 417, 434.) Nothing stated by Juliana or counsel for the guardians has any of the aspects of an express or implied stipulation or waiver. As we read the record, the guardians merely reiterated the content of prior settlement negotiations and expressed their intent to abide by the terms of visitation if so ordered by the court.

Nor, we conclude, did the parties enter into any agreement for posttermination or postadoption visitation rights that complies with Family Code section 8616.5. No definitive agreement for visitation was reached; no terms for visitation were delineated; no written agreement was submitted to the court; no understanding or express consent to the terms of a visitation order was conveyed by the guardians. We find that the references to visitation in the record do not constitute a stipulation, waiver, or valid agreement for visitation.[19] Accordingly, the trial court erred by granting visitation rights to the parents.

## DISPOSITION

Although the matter must be remanded with directions to the court to ensure ICWA compliance, we decline to reverse the judgment that terminated parental rights. Instead, we order a limited remand with directions to the trial court to effectuate proper inquiry, and to comply with the notice provisions of the ICWA if Indian heritage is indicated. If, after proper inquiry and notice a tribe determines the minors are Indian children, the parents may petition the court to invalidate the termination of parental rights upon a showing that such

---

[19] Nothing we have said precludes the parties from entering into a voluntary agreement for postadoption visitation, at least before entry of a final adoption order. (See *In re Zachary D., supra*, 70 Cal.App.4th 1392, 1397–1398.)

action violated the provisions of the ICWA. If the minors are not found to be Indian children, the judgment is affirmed, with the exception of that part of the judgment that granted visitation to the parents. The visitation order is reversed.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied March 10, 2010, and the petitions of objectors and appellants for review by the Supreme Court were denied April 22, 2010, S180958.